In re Leo W. KOOPMANS and Connie J. Koopmans, Debtors.

EMPIRE ENTERPRISES, INC., Plaintiff,

v.

Leo W. KOOPMANS, Connie J. Koopmans, and William T. Thurman, Trustee, Defendants.

Bankruptcy No. 81–00510.
Civ. No. 81P–0890.

United States Bankruptcy Court,
D. Utah.

Aug. 11, 1982.

Brent V. Manning, Holme, Roberts & Owen, Salt Lake City, Utah, for Empire Enterprises, Inc.

David E. Leta, Roe & Fowler, Salt Lake City, Utah, for debtors.

William T. Thurman, McKay, Burton, Thurman & Condie, Salt Lake City, Utah, pro se.

## INTRODUCTION AND BACKGROUND

RALPH R. MABEY, Bankruptcy Judge.

This case asks when property is "necessary to an effective reorganization" under 11 U.S.C. Section 362(d)(2)(B).

Debtors filed a petition under Chapter 11 on February 18, 1981. Plaintiff Empire Enterprises, Inc. (Empire) brought this action for relief from the stay on October 27. The complaint alleged, among other things, that debtors have no equity in the property at issue and no "prospect of rehabilitation."

A preliminary evidentiary hearing was held November 25. The evidence showed that debtors are in the business of buying and managing real property. They own 14 homes which have been converted into apartments and rented. The homes are valued at $973,000. Total debt equals $484,-504. Empire holds a lien for $41,000 on one of these homes worth $60,000.[1] Other debt, however, totalling $62,600, encumbers the

---

1. Empire is the seller and debtors are the buyers under a contract for deed. This court has ruled that, where debtors are vendees, the contract for deed, for purposes of Chapter 11, will be treated as a lien rather than an executory contract. *See In re Booth*, 19 B.R. 53 (Bkrtcy. D.Utah 1982).

home. Hence, debtors have no equity in the home.[2]

No evidence was presented concerning the rehabilitation of debtors. The home, however, earns $226 net income per month,[3] and if sold, would satisfy Empire and some of the junior debt. Moreover, this junior debt encumbers the other property. Reduction in this debt, therefore, would enlarge the equity in the other property.

By its complaint, Empire argued that the debtors have no equity in the home and no prospect of rehabilitation. Debtors have no equity in the home. And since they did not carry their burden of persuasion on the issue of rehabilitation, if this be the standard under Section 362(d)(2)(B), Empire would be entitled to relief from the stay. By resisting the complaint, however, debtors maintained that the standard is not whether they have a prospect of rehabilitation, but whether the property is "necessary to an effective reorganization." The court concurred with debtors and held that property may be "necessary to an effective reorganization" if it is necessary either to an effective rehabilitation or to an effective

liquidation. Because the meaning of Section 362(d)(2)(B) is frequently debated in stay litigation in this district, the court files this explanatory opinion.

## THE MEANING OF SECTION 362(d)(2)(B)

Section 362(d)(2) requires relief from the stay of an act against property when two conditions are met: (2)(A) "the debtor does not have an equity in such property" and (2)(B) "such property is not necessary to an effective reorganization."

Some courts, taking their cue from Collier, have construed subpart (2)(B) to require relief from the stay when there is no prospect of rehabilitation: "[N]ot every asset will be necessary for an *effective* reorganization. The reference to an 'effective' reorganization should require relief from the stay if there is no reasonable likelihood of reorganization due to creditor dissent or feasibility considerations." 2 Collier on Bankruptcy ¶ 362.07[2] at 362–49—362–50 (15th ed. 1981) (emphasis in original). *See also id.* ¶ 362.07[3] at 362–51.[4]

**2.** There is a divergence of opinion over what constitutes "equity" within the meaning of Section 362(d)(2)(A). The statute refers to the equity of the debtor which suggests the difference between the value of the property and all encumbrances against it. This is the predominant view. *See, e.g.,* Note, "Automatic Stay Under the 1978 Bankruptcy Code: An Equitable Roadblock to Secured Creditor Relief," 17 San Diego L.Rev. 1113, 1123 (1980); *In re La-Jolla Mortgage Fund,* 18 B.R. 283, 290 (Bkrtcy. S.D.Cal.1982); *In re Mikole Developers, Inc.,* 14 B.R. 524, 525 (Bkrtcy.E.D.Pa.1981); *In re Gardner,* 14 B.R. 455, 456 (Bkrtcy.E.D.Pa.1981); *In re Dallasta,* 7 B.R. 883, 885 (E.D.Pa.1980). Some, however, see equity as the difference between the value of the property and the lien which is the subject of relief. *See, e.g., In the Matter of Spring Garden Foliage, Inc.,* 15 B.R. 140, 143 (Bkrtcy.M.D.Fla.1981); *In re Wolford Enterprises, Inc.,* 11 B.R. 571, 574 (Bkrtcy.S.D. W.Va.1981). In this case, the junior lienors on the home have interests in other property of the estate. Through marshaling, this other property may satisfy the junior lienors. Whether these circumstances permit a finding of equity in the home was not argued by the parties and is not decided by the court.

**3.** The home has 7 apartments. At full occupancy it might generate $950 per month. The

average income for September, October, and November was $765. Expenses include $309 to Empire, $200 for utilities, and $30 for maintenance. This means a monthly net income of $226. An officer of Empire testified that the annual net income was $5,000, which means a monthly net income of $416.

**4.** The leading case may be *In the Matter of Terra Mar Associates,* 3 B.R. 462 (Bkrtcy.D. Conn.1980) which held that Section 362(d)(2)(B) required a showing "that there is a reasonable possibility of a successful reorganization within a reasonable time." *Id.* at 466. Noting that in single asset real estate cases the property may be essential, it nevertheless ruled that " '[i]ndispensability of the property to the debtor's survival and hope of rehabilitation is not enough . . . to justify continuation of the stay when rehabilitation is hopeless.' " *Id.* The "reasonable possibility" standard does not include a hope " 'that somewhere, someone will fund an arrangement or refinance the mortgage with the plaintiff. This is entirely too slim a reed upon which this court should exercise its discretion and keep the plaintiff at bay while the debtor continues to pray.' " *Id.*

Other cases have adopted the *Terra Mar* approach, although they have varied in phrasing the standard. *See, e.g., In re BBT,* 11 B.R. 224,

This construction, while plausible, may be questioned on several fronts. The language of subpart (2)(B) may bear faint resemblance to a rehabilitation test. The legislative history of subpart (2)(B) appears to reinforce this view, since the genesis and evolution of the statute may evince a concern with the need for property in the business or a plan, not with the rehabilitation of debtors. And while the language and history of subpart (2)(B) may not be conclusive, reading a rehabilitation test into the statute may be anomalous in light of other provisions of the Code.

*The Language and Legislative History of Section 362(d)(2)(B)*

"The starting point in every case involving construction of a statute is the language itself." *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 756, 95 S.Ct.

7 B.C.D. 769 (Bkrtcy.D.Nev.1981) ("an effective plan is a plan which is feasible and must be received and weighed in the light of the condition of the economy, the quality of management, the sources of capital necessary to the production of income, and the resiliency of the business to weather the cycles of change"); *In re Mikole Developers, Inc.,* 14 B.R. 524 (Bkrtcy. E.D.Pa.1981) ("debtor's high hopes for reorganization or need alone for the property is not the *sine qua non* under Section 362(d)(2)(B)"); *In re Dublin Properties,* 12 B.R. 77 (Bkrtcy.E.D. Pa.1981) ("more than a mere financial pipe dream"); *In re Antilles Yachting, Inc.,* 4 B.R. 470 (Bkrtcy.D.V.I.1980) ("reasonable prospect for a going concern reorganization"); *In re Kors, Inc.,* 11 B.R. 324 (Bkrtcy.D.Vt.1981) (property not necessary "[i]f all the debtor can offer at this time is high hopes without any financial prospects on the horizon to warrant a conclusion that a reorganization in the near future is likely"); *In re Rogers Development Corp.,* 2 B.R. 679 (Bkrtcy.E.D.Va.1980) ("the court at this time cannot find that a reorganization is not feasible").

Under the Act, likewise, "[t]he degree of likelihood of a successful rehabilitation required to justify continuation of a stay . . . is variously stated. The typical formulation in a case denying relief is that reorganization appears to be a 'reasonable possibility.' In a recent Chapter XII case Judge Babitt was satisfied by evidence that 'it is as reasonably likely that the debtor will successfully rehabilitate as not.' The typical rationale when relief is granted is that reorganization is not a 'realistic expectation.' Where the prospects for successful rehabilitation in a Chapter XII case were 'dim' the court continued the stay for three months." Kenne-

1917, 1935, 44 L.Ed.2d 539 (1975). Section 362(d)(2)(B) asks whether the property is necessary to an effective reorganization. This language, viewed alone or in tandem with subpart (2)(A), may be different from the rehabilitation test. The former is concerned with whether an asset may be instrumental in the continued operation or ultimate sale of the business. The latter is concerned with whether the business, viewed as a bundle of assets, liabilities, management, markets, and the economy at large, can stay alive. If the business rather than one house were the focus under subpart (2)(B), then net worth of the business rather than equity in the property might be considered under subpart (2)(A).[5] Instead, Section 362(d)(2) is satisfied when the business is under water (even when rehabilitation is hopeless) so long as there is equity in the house.[5a]

dy, "The Automatic Stay in Bankruptcy," 11 U.Mich.J.L.Ref. 175, 241–242 (1978).

5. In this case, for example, the schedules show a net worth for the business, although there is no equity in the home.

5a. Under the Act, relief from stay was possible, even where property had equity, if there was no prospect of rehabilitation. *See, e.g., In re Empire Steel Co.,* 228 F.Supp. 316 (D.Utah 1964). But relief from stay was denied, even where property had no equity, if there was a prospect of rehabilitation. *See, e.g., In re Yale Express System, Inc.,* 384 F.2d 990 (2d Cir. 1967). Thus, under the Act, the rehabilitation test, as a criterion for relief from stay, was independent of the question of equity. *See, e.g.,* Peitzman and Smith, "The Secured Creditor's Complaint: Relief From The Automatic Stays in Bankruptcy Proceedings," 65 Cal.L. Rev. 1216, 1231–1232 (1977). The necessity test, on the other hand, was associated with the question of equity. *See, e.g.,* Webster, "Collateral Control Decisions in Chapter Cases: Clear Rules v. Judicial Discretion," 51 Am.Bank.L.J. 197, 222 (1977). It is improbable, in light of this background, that rehabilitation and equity rather than necessity and equity would be coupled in the Code.

Similarly, Section 362(d)(2)(B), by forbidding relief from stay where property has equity, overrules cases such as *Empire Steel* which held that a want of rehabilitation, even with equity, was dispositive. These circumstances are explained, in part, by the provisions for plans of liquidation, discussed below, but they also suggest that there is no place for a rehabilitation test in subpart (2)(B).

The term, "effective reorganization," may not transform subpart (2)(B) into a rehabilitation test. First, "effective" modifies "reorganization," which embraces rehabilitation and liquidation; property may be necessary either to an "effective" rehabilitation or to an "effective" liquidation.[6] But courts which apply the rehabilitation test, because they look to the condition of the business rather than the need for an asset, will give relief from the stay where there is no prospect of rehabilitation, whether or not the asset is necessary for an effective liquidation. Under these circumstances, neither word, "necessary" or "reorganization," may be accorded the breadth intended by Congress.

Second, where Congress meant to employ a rehabilitation test, as in 11 U.S.C. Section 1112(b)(1), it knew how to say so. The negative implication may be that no similar meaning was attached to subpart (2)(B).[6a]

Third, the choice of words, "effective reorganization," may be explained by formulations of the necessity test under prior law. This was phrased as "the likely need of the property subject to the lien for a successful reorganization," Kennedy, "The Automatic Stay in Bankruptcy," 11 U.Mich.J.L.Ref. 175, 239 (1978), and whether "the withdrawal of the property by the secured party will materially affect the prospect of a successful arrangement or reorganization," Seidman, "The Plight of The Secured Creditors in Chapter XI," 80 Com.L.J. 343, 347 (1975). Thus, the term "effective reorganization," may be a carryover of familiar verbiage employed with and merely incidental to the necessity test under the Act, which held that the property is necessary, because without it, there may be no reorganization.[7]

Moreover, the necessity test, notwithstanding its use of the term, "effective reorganization," was distinct from the rehabilitation test. This distinction continues in subpart (2)(B), but with the modification, noted above, that "reorganization" has an expanded scope; it includes liquidation. Prior law used the rehabilitation test in addition to the necessity test; if they both had meant the same thing, one or the other would have been superfluous. Congress, by focusing on necessity rather than rehabilitation in subpart (2)(B), showed that it intended to recognize and perpetuate, rather than blur, this distinction. Indeed, now that reorganization may mean liquidation, necessity cannot be tied to rehabilitation alone. In light of this distinction, and the new scope for reorganization, it is improbable that the necessity language creates a rehabilitation test in subpart (2)(B).[8]

---

6. Section 362(d)(2)(B) speaks of property "necessary to an effective reorganization." Section 1112(b)(1) asks whether there is a "reasonable likelihood of rehabilitation." According to Collier, " '[r]ehabilitate' has been defined to mean 'to put back in good condition; re-establish on a firm, sound basis.' Rehabilitation, as used in Section 1112(b)(1), does not mean the same thing as reorganization, as such term is used in Chapter 11. Since a debtor can be liquidated in Chapter 11, the ability to confirm a plan of reorganization is considerably different than reaching a firm, sound financial base." 5 Collier on Bankruptcy, *supra* ¶ 1122.03[2][d][i] at 1112–15. *See infra* at 13–17.

6a. *See supra* note 6, at 5.

7. *See, e.g., In re Yale Express System, Inc.,* 384 F.2d 990 (2d Cir. 1967) ("it is clear beyond cavil that the prospects of reorganization would be frustrated if the reclamation petition were granted"). *See also, Central R.R. of New Jersey v. Manufacturers Hanover Trust Co.,* 421 F.2d 604 (3d Cir. 1970) (the funds will contribute to the possibility of a successful reorganiza-tion); *In re Bric of America, Inc.,* 4 C.B.C. 34 (M.D.Fla.1975) ("that the preservation of the properties in question or of the equities in the properties are indispensable and essential either to the business of the debtor or to a successful consummation of the arrangements").

8. The history of collateral control provisions, including Section 362(d), indicates that they were drafted by individuals familiar with the tests for relief from stay and capable of distinguishing between them. The Commission proposal, for example, made "[n]o attempt .... to codify the case law as to when the use of collateral must cease or as to the adequacy of protection in any given situation. This is left to case-by-case development." Report of the Commission on the Bankruptcy Laws of the United States, H.Doc.No. 93–137, pt. II, at 237 (1973). This alarmed lenders who sought a codification of standards. *See generally,* Murphy, "Use of Collateral in Business Rehabilitations: A Suggested Redrafting of Section 7–203 of the Bankruptcy Reform Act," 63 Cal.L.Rev. 1483 (1975); Webster, "Collateral Control De-

The legislative history lends some support to this analysis. As proposed, Section 362(d) of H.R. 8200, 95th Cong., 1st Sess. (1977) and Section 362(d) of S. 2266, 95th Cong., 1st Sess. (1977) did not contain a necessity test. The former permitted relief for cause including a lack of adequate protection. The latter allowed relief where debtor had no equity in the property.

The necessity test was the brainchild of insurance industry representatives who testified at hearings on S. 2266. They believed "that the basic concept of Section 362(d) which authorizes the court to lift the automatic stay where the debtor has no equity in the property is sound," but "in order to permit reorganization to go forward *where the property is essential to an ongoing business*, an exception must be provided for such situation." *Hearings on S. 2266 and H.R. 8200 Before the Subcomm. on Improvements in Judicial Machinery of the Sen. Comm. on the Judiciary*, 95th Cong., 1st Sess. 856 (1977) (emphasis supplied). In their view, "[i]n the case of a piece of real property . . . which is the security for a real estate mortgage *and not part of a business* that should be reorganized for the benefit of all parties in interest, the stay should be lifted." *Id.* (Emphasis supplied.) They argued that "whatever changes are made to Section 362(d) . . . to accommodate to corporate reorganizations [sic] not affect the real estate mortgage transactions which warrants [sic] different treatment. This can be accomplished by providing in Section 362(d) that relief from the automatic stay is limited to a situation where the debtor has no equity in the property and the property is not necessary to an effective reorganization of the debtor, *and that property shall be deemed not necessary to the reorganization if* it *is real property on which no business is being conducted by the debtor other than the business of operating the real property and activities incidental thereto.*" *Id.* at 857. (Emphasis supplied.) [9]

These proposals, including guidelines explaining "necessary to an effective reorganization," were added to Section 362(d), S. 2266, 95th Cong., 2d Sess. (1977) and were elucidated in the Senate Report: Section 362(d) is intended "to reach the single-asset apartment type cases which involve primarily tax-shelter investments and for which the bankruptcy laws have provided a too facile method to relay [sic] conditions, but not the operating shopping center and hotel cases where attempts at reorganization should be permitted." Sen.Rep.No. 95–989, 95th Cong., 2d Sess. 53 (1978), U.S.Code Cong. & Admin. News 1978, pp. 5787, 5839.[10]

---

cisions in Chapter Cases: Clear Rules v. Judicial Discretion," 51 Am.Bank.L.J. 197 (1977). Commentators suggested that Congress codify either the Commission notes to Section 7–203 or the ruling in *In re Third Avenue Transit Corp.*, 198 F.2d 703 (2d Cir. 1952). *See* Coogan, Broude, and Glatt, "Comments on Some Reorganization Provisions of the Pending Bankruptcy Bills," 30 Bus.Law. 1149, 1177–1178 (1975). The *Third Avenue* ruling, but not the Commission notes, contained a rehabilitation test. Adoption of the Commission notes in 11 U.S.C. Section 361, rather than the *Third Avenue* ruling, suggests a rejection of the rehabilitation test. *See, e.g.,* Coogan, "The New Bankruptcy Code: The Death of Security Interest?" 14 Ga.L.Rev. 153, 163 (1980) ("however, one test of *Third Avenue* relating to the debtor's ability to get back the collateral—a probability that the debtor would be reorganized—was not carried over into Section 361").

**9.** They recommended the following changes: "1. Section 362(d) be amended to provide that the court shall grant relief from the automatic stay if the debtor has no equity in the property and the property is not necessary to an effective reorganization of the debtor. 2. Section 362(d) and other appropriate sections of S. 2266 be amended to provide that a property shall be deemed not necessary to an effective reorganization of the debtor if the property is real property on which no business is being conducted by the debtor other than the business of operating the real property and activities incidental thereto. 3. Appropriate provisions be inserted in S. 2266 providing for abandonment or sale by the trustee of property in which the debtor has no equity, and which is not necessary to the debtor's reorganization." *Senate Hearings, supra* at 856.

**10.** Section 362(d), as amended, and for purposes of the Senate Report, read as follows: "The court shall grant relief from the stay if the court finds that the debtor has no equity in the property subject to the stay and such property is not necessary to an effective reorganization of the debtor. For the purpose of this subsec-

As enacted, Section 362(d)(2) dropped the guidelines explaining "necessary to an effective reorganization," [11] but floor leaders commented upon its purpose: Section 362(d)(2) "is intended to solve the problem of real property mortgage foreclosures of property where the bankruptcy petition is filed on the eve of foreclosure.[12] The section is not intended to apply if the business of the debtor is managing or leasing real property, such as a hotel operation, even though the debtor has no equity if the property is necessary to an effective reorganization of the debtor." 124 Cong.Rec. H11,092–11,093 (daily ed., September 28, 1978).

Section 362(d)(2)(B), by its terms and in light of its history, contains a necessity not a rehabilitation test. Congress was concerned with the need for property, according to the type of property and its relation to the business. If lenders were correct in their conclusion that Chapter 11 is inappropriate for certain tax-sheltered, single-asset

real estate projects, "[t]his limitation on stays, by its very nature, would not conflict with the goal of debtor rehabilitation." *Senate Hearings, supra* at 705.[13]

### The Rehabilitation Test and Other Provisions of the Code

"Relief from the stay cannot be viewed in isolation from the reorganization process," including all remedies, such as dismissal, vouchsafed to creditors, and all options, such as liquidation, available to others under the Code. *In re Alyucan Interstate Corp.*, 12 B.R. 803, 805–806 (Bkrtcy.D.Utah 1981). Congress, of course, was concerned with the circumstances, including a want of rehabilitation, which bear upon a stay of reclamation. It provided for this concern, however, not in Section 362(d)(2)(B), but in Section 1112(b)(1), while preserving the right of parties to propose a plan of liquidation under 11 U.S.C. Section 1123(b)(4).

tion (d), property is not necessary to an effective reorganization of the debtor if it is real property on which no business is being conducted by the debtor other than the business of operating the real property and activities incidental thereto. Where the debtor owns two or more properties for which an established business enterprise has been created for the purpose of managing and leasing such properties, however, the court may find that one or more of such properties are essential to the effective reorganization of such real estate management enterprise. Where a request is made to grant relief from the stay with respect to property not necessary to an effective reorganization of the debtor, and the court determines that the debtor has equity in the property, the court shall authorize or order the sale of the property pursuant to Section 363. The hearing of such motion shall take precedence over all matters except older matters of the same character."

11. The deletion of guidelines has been described as a "substantial modification." Kennedy, "Automatic Stays Under the New Bankruptcy Law," 12 U.Mich.J.L.Ref. 1, 45 (1978). Now under Section 362(d)(2) "the bankruptcy court may, but is not required to, find that an encumbered building which the debtor operates without having an equity in it is not essential to an effective reorganization. The subsection avoids constitutional doubts that surely would have clouded application of the Senate approved subsection." *Id.* at 46. The nature of the "constitutional doubts" is not indicated.

12. This sentence of the floor debate is troublesome. In the context of the entire legislative record, however, it may be a condemnation of debtors who own real estate as a tax shelter and file to prevent the recapture of accelerated depreciation as ordinary income in the year of foreclosure rather than for the purpose of reorganizing a business. *See, e.g.*, Kennedy, "Automatic Stays Under the New Bankruptcy Law," 12 U.Mich.J.L.Ref. 1, 45 n. 188 (1978); and *infra* note 18 at 18–21.

13. True, lenders believed that "in the context of single project real estate entities .... experience shows that inept management or a poor market, or a combination of both, is usually the cause of insolvency, *making rehabilitation unlikely to succeed." Senate Hearings, supra* at 705. (Emphasis supplied.) For this reason, they suggested that "the automatic stay should terminate after a fixed period, *e.g.*, 60 days, *unless the debtor can successfully show that reorganization is reasonably likely to succeed." Id.* (Emphasis supplied.) Congress, while adopting the 60 day deadline in Section 362(e), did not favor this proposal. Indeed, the proposal was framed in terms of rehabilitation and Section 362(d)(2)(B) was written in terms of need, highlighting the distinction between the tests and showing that Congress selected one over the other. *See infra* note 18, at 405–407.

*(1) Relief From Stay and Dismissal.* Sections 362(d)(2)(B) and 1112(b)(1) involve elements and procedures which are tailored to their own purposes. These elements, procedures, and purposes are distinct; their mixture, for example, by making determinations akin to dismissal in stay litigation, may do both theoretical and practical violence to the statutory scheme.

Under Section 362(d)(2)(B) relief is mandatory, whereas under Section 1112(b)(1) dismissal is discretionary, when certain conditions are met. This is because the standards for relief in subpart (2)(B) are definite and easily applied. There is either equity or not. The property is either necessary or not. As between the creditor and the estate there is a bright line for decision. The standards for dismissal, however, are indefinite and difficult to apply. Whether or not rehabilitation is "probable" or even "possible" may be imponderable. How much "delay" and "prejudice" are tolerable is a matter of degree. The "best interests" of creditors and the estate, for better or for worse, must be measured by the length of the chancelor's foot.

For these reasons, relief from stay hearings are held upon request, usually by a single creditor, often early in a case. The hearings are expedited and may be informal. The debtor has the burden of proof on all questions except for the existence of equity. The issues are confined to the creditor and his collateral; thus, notice to all parties in interest is unnecessary. Counterclaims, even those which seek to invalidate liens or reduce claims, and which may affect the value of the estate, are discouraged. Resolution must be swift.

Motions to dismiss, on the other hand, may be brought by any party. The hearings need not be accelerated and may be formal. The movant has the burden of proof. The issues are broad, involving the future of the estate, thus, notice to all or representative parties in interest is necessary. The presentation of views should be many-sided. Indeed, the trustee or creditor committees may investigate the business as a prelude to the hearing. Time and preparation commensurate with the relief sought are expected.

In short, the rehabilitation test must be applied with discretion, not compulsion. It is amenable to ultimate, complex issues such as dismissal, but not to interim, abbreviated contests over the stay. It is workable given the procedures of Section 1112(b)(1), but not of Section 362(d)(2)(B).[14]

---

**14.** In this regard, hearings under Section 362(d)(2)(B) are for the single creditor while hearings under Section 1112(b)(1) are for everybody. The rehabilitation test, in theory, if not in practice, is identical with the feasibility standard for confirmation of plans under Chapter X. *See, e.g.,* Kennedy, "The Automatic Stay in Bankruptcy," 11 U.Mich.J.L.Ref. 175, 239 (1978); Nicholson, "Chapter XII: Rehabilitation or Resurrection? The Cram-Down and Other Problems," 26 Emory L.J. 489, 503–504 (1977). *Cf.* Baker, "Certificates of Indebtedness in Reorganization Proceedings: Analysis and Legislative Proposals," 50 Am.Bank.L.J. 1, 35–36 (1976); Peitzman and Smith, "The Secured Creditor's Complaint: Relief From the Automatic Stays in Bankruptcy Proceedings," 65 Cal.L.Rev. 1216, 1232 (1977). And feasibility is measured by an enterprise valuation using a capitalized earnings approach. *See, e.g., Consolidated Rock Products Co. v. DuBois,* 312 U.S. 510, 525, 61 S.Ct. 675, 684, 85 L.Ed. 982 (1941). This approach embraces "all facts relevant to future earning capacity and hence to present worth, including, of course, the nature and condition of the properties, the past earnings record, and all circumstances which indicate whether or not that record is a reliable criterion of future performance." *Id.* at 526. These circumstances include all "relevant information about the company and its affairs, including data concerning its present and past physical and financial condition, the competence and fidelity of its management, the causes of its financial collapse, and its past operating record and policies; adjusted for unusual or non-recurring conditions or items. To analysis of the company is added a broad study of the industry and competitive conditions within it and a consideration of general economic factors likely to affect the industry and the debtor." Gardner, "The SEC and Valuation Under Chapter X," 91 U.Pa.L.Rev. 440, 444–445 (1943). This process, because of expense and delay, may be inimical to creditors and insensitive to the time value of money. *See, e.g.,* H.R.Rep.No. 95–595, 95th Cong., 1st Sess. 222 and 260 (1977). The courts, aware of these facts, and in unspoken criticism of the process, "eschew ... elaborate hearings on the prospects for successful reorganization." Kennedy, "The Automatic Stay in Bankruptcy," *supra* at

(2) *Rehabilitation and Liquidation.* A rehabilitation test under Section 362(d)(2)(B) may be inconsistent with provisions for plans of liquidation found in Section 1123(b)(4). This can be shown, first, by examining policies which forbade liquidation in reorganization under the Act, and second, by noting how these policies have been superseded by the Code.

Under the Act, Section 141, former 11 U.S.C. Section 541, required dismissal of a petition at the outset of a case if it was not filed in "good faith." "Good faith" was defined, under Section 146, former 11 U.S.C. Section 546, among other things, to require a reasonable likelihood of rehabilitation. Thus, "[l]iquidation and reorganization under the National Bankruptcy Act [were] commonly regarded as two separate and unrelated proceedings," and the "good faith" hearing was the instrument used to insure "the cleavage between the two proceedings." Cary, "Liquidation of Corporations in Bankruptcy Reorganization," 60 Harv.L.Rev. 173, 173 (1946).

This "cleavage," however, was fictitious, in that plans of "orderly liquidation" still passed muster under the Act, *see Cary, supra* at 176–184 and 186–192, and astigmatic because it insisted upon a distinction between rehabilitation and liquidation instead of considering "what the best procedure is to exploit going-concern value and salvage as much as possible for the creditors and security holders." *Id.* at 175. Business considerations, such as special industry characteristics, the condition of the firm, or a favorable offer, may recommend liquidation over rehabilitation. The "rule barring liquidation [under former law] fails to recognize that the amount thereby realized may be substantially greater than the proceeds in straight bankruptcy. As distinguished from Chapter X, the procedure in bankruptcy is formalized and directed exclusively to a sale of the assets. The primary emphasis is upon a public auction, though authority is given for a private sale upon application to the court and for good cause shown. Writers have spoken with cause of the impatience of the bankruptcy court to secure an early sale and distribution, and it is apparent that by forcing the debtor into bankruptcy any alternative to a forced sale is forever destroyed. In contrast with the straight bankruptcy provisions, the emphasis in reorganization is upon exploring and taking advantage of the available alternative. The court can keep the business alive, conserve its good will, maintain the bargaining position of the trustee, and thus facilitate its disposition of a going concern. For these reasons a variety of cases have indicated that the sale of the assets and good will of a debtor under the provisions of Chapter X yields to creditors and security holders a proportionately larger return than ordinary bankruptcy procedure.... Adherence to these principles should reduce the deflationary effects of business failure, which is one of the primary objectives of the reorganization provisions; it will ensure the continuance wherever possible of a going business, if not by the original owners, then by the new purchasers, and at the same time maximize the participation of creditors and security holders." *Id.* at 196–197 and 199.

Taking these arguments to heart, the Code overrules prior law and permits liquidation in reorganization. *See, e.g., In re Searles Castle Enterprises, Inc.,* 17 B.R. 440, 8 B.C.D. 910 (Bkrtcy.App.Pan., 1st Cir., 1982); *L. N. Scott Company, Inc.,* 13 B.R. 387 (Bkrtcy.E.D.Pa.1981); 5 Collier on Bankruptcy, *supra* ¶ 1112.03[2][d][i] at

---

241. The process thus is compromised in practice. Congress, recognizing that the process, in theory, was harmful, and in practice, perfunctory, sought to avoid it wherever possible. Thus, requiring a rehabilitation test under subpart (2)(B), before parties have had an opportunity, through negotiation, to avoid this process, may ignore the learning of courts and defeat the intent of Congress. *Cf. In re Barrington Oaks General Partnership,* 15 B.R. 952 (Bkrtcy.

D.Utah 1981). Indeed, this process, because it affects not merely the collateral of one creditor but also the interests of all parties, should not be allowed to bottleneck administration of the estate except at critical stages of the proceedings such as a motion for dismissal or confirmation of a plan. In this instance, the competitive urge of one must yield to the cooperative good of many. *See also, infra* note 17, at 404–405.

1112–15 n.20; P. Murphy, Creditors' Rights in Bankruptcy ¶ 6–19 at 6–27 (1980); Anderson and Wright, "Liquidating Plans of Reorganization," 56 Am.Bank.L.J. 29, 30 and 44 (1982); King, "Chapter 11 of the 1978 Bankruptcy Code," 53 Am.Bank.L.J. 107, 124 (1979).

Overruling prior law and authorizing liquidation in reorganization, without more, however, was insufficient. It was necessary to coordinate the standards for dismissal with provisions for liquidation so that vestiges of prior law, such as the good faith hearing, did not resurface to complicate realization of the reform goal.

For this reason, the authors of the Code did not write a measure similar to Sections 141 and 146 into Chapter 11, but left dismissal to await the request of a party under Section 1112(b). *See, e.g.,* P. Murphy, *supra*; Anderson and Wright, *supra.* This design was recognized by creditors who, in testimony on S. 2266, believed that they "should be able to seek a dismissal of the proceedings where continuing losses are likely or where there is no reasonable possibility of rehabilitation. We approve the language of § 1112(b) of S. 2266 *and believe that it is necessary in light of the absence of 'good faith' (see § 146 of the existing Act) and 'indemnity' (see §§ 326*

*and 426 of the existing Act) hearings in Chapter 11.*" *Senate Hearings, supra* at 577. (Emphasis supplied.) The legislative history likewise indicates that "[t]his Section [1112(b)] brings together *all* of the conversion and dismissal rules for Chapter 11 cases," H.R.Rep.No.95–95, 95th Cong., 1st Sess. 405 (1977), U.S.Code Cong. & Admin. News 1978, p. 6361 (emphasis supplied), suggesting that Section 1112(b) is the exclusive arbiter of tests concerning the rehabilitation of debtors.

Moreover, Section 1112(b)(1) permits relief upon a showing of the "absence of a reasonable likelihood of rehabilitation" *and* "continuing loss to or diminution of the estate." [15] This dual requirement highlights the difference between "rehabilitation" and "reorganization." Section 1112(b)(1) requires more than the absence of rehabilitation, *viz.*, continuing loss, because otherwise it would be inconsistent with those provisions which permit a plan of reorganization to be a plan of liquidation. For the same reason, a rehabilitation test in Section 362(d)(2)(B) would contradict the provisions for liquidation. Liquidation is permitted, if rehabilitation is not in the cards, so long as there is no "continuing loss to or diminution of the estate." [16] In other words, it would be anomalous if one credi-

---

**15.** Both factors must be present before relief may be granted. This is emphasized in the legislative history: "Section 1112 of the House amendment represents a compromise between the House bill and Senate amendment with respect to the factors constituting cause for conversion of a case to Chapter 7 or dismissal. The House amendment combines two separate factors contained in Section 1112(b)(1) and Section 1112(b)(2) of the Senate amendment. Section 1112(b)(1) of the House amendment permits the court to convert a case to a case under Chapter 7 or to dismiss the case if there is both a continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation; requiring both factors to be present simultaneously represents a compromise from the House bill which eliminated both factors from the list of causes enumerated." 124 Cong.Rec. H11,103 (daily ed., September 28, 1978).

**16.** Similarly, 11 U.S.C. Section 1129(a)(11), which deals with feasibility in a plan, contemplates liquidation in reorganization. Under Chapter XI of the Act, there was a divergence

of views, with some maintaining that feasibility meant rehabilitation and others arguing that "the creditors must be assured of receiving what is promised them under the arrangement . . . . not . . . . an assurance of [the debtor's] future business success." *In re American Trailer Rentals Co.,* 325 F.2d 47, 53 (10th Cir. 1963), *rev'd on other grounds* 379 U.S. 594, 85 S.Ct. 513, 13 L.Ed.2d 510 (1965). The Commission standard for feasibility was met where the plan was "not likely to be followed by a liquidation of, or a need for further financial reorganization by, the debtor." Report of the Commission on the Bankruptcy Laws of the United States, H.Doc.No. 93–103, pt. II, Section 7–310 (1973). This proposal was applauded by proponents of the rehabilitation, rather than the *American Trailer,* approach. *See, e.g.,* Countryman, "Some Good and Some Bad Features of the Proposed New Bankruptcy Act," 7 U.C. C.L.J. 213, 230–231 (1975). As enacted, however, the feasibility requirement is met where "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor

tor, absent notice to other creditors, and at an accelerated hearing, could defeat an opportunity to liquidate because a rehabilitation test was not met under Section 362(d)(2)(B), while another creditor, after

notice to all creditors, and at an unhurried hearing, could not obtain a similar result without showing both a want of rehabilitation and continuing loss under Section 1112(b)(1).[17]

or any successor to the debtor under a plan, *unless such liquidation or reorganization is proposed in the plan."* (Emphasis supplied.) Reading a rehabilitation test into Section 362(d)(2)(B) is thus at odds with the concept of feasibility under Section 1129(a)(11).

**17.** A further reason for rejecting a rehabilitation test in Section 362(d)(2)(B) is that such a test is impracticable. When a debtor files a petition, he is on the verge of collapse. He may have suffered losses for months. Creditors are foreclosing. Financial aid is a mirage. The forecast required under the rehabilitation test extrapolates from the past. But does the past of any debtor suggest a propitious future? Thus the rule, *circulum in probando*, becomes a self-fulfilling prophecy.

The debtor needs an overhaul using the tools of reorganization. He files because executory contracts may be rejected. Liens may be avoided. Property may be sold. Liabilities may be reduced or the terms of payment altered. If mismanagement is the cause of failure, a trustee may be appointed. Meanwhile, debtor, the trustee, creditor committees, and other parties in interest are bargaining toward a plan. These activities and the times set for their accomplishment are at odds with the rehabilitation test. No one knows whether the debtor can survive until he has done what Chapter 11 affords him occasion to do: clean house and work out a plan. *See, e.g.,* Note, "Automatic Stay Under the 1978 Bankruptcy Code: An Equitable Roadblock to Secured Creditor Relief," 17 San Diego L.Rev. 1113, 1122 n.76 (1980). *Cf.* Baker, "Certificates of Indebtedness in Reorganization Proceedings: Analysis and Legislative Proposals," 50 Am. Bank.L.J. 1, 40–42 (1976); Martin, "Creditor Alternatives to Obtain Relief From Automatic Stays in Bankruptcy," 98 Banking L.J. 525, 541–542 (1981); *In re Chicago, Rock Island and Pac. R. Co.,* 545 F.2d 1087, 1090 (7th Cir. 1976). Indeed, predictions in this regard may be more *difficult under the Code where parties enjoy* increased opportunities through negotiated plans. *Cf. In re Barrington Oaks General Partnership,* 15 B.R. 952 (Bkrtcy.D.Utah 1981).

Creditors might answer that, whether a patient can survive is not known before surgery, but a skillful physician, with reasonable certainty, can diagnose a terminal illness. But business is not an exact science. The rehabilitation test "requires the court to speculate on the probable outcome of a complicated and uncertain process." Kennedy, "The Automatic Stay in Bankruptcy," 11 U.Mich.J.L.Ref. 175, 242 (1978).

Indeed, at several points in the legislative history, creditors questioned the ability of courts to forecast the outcome of cases. They insisted, for example, that Congress strike the concept of an administrative priority as a method of adequate protection on the grounds that "such protection is too uncertain to be meaningful," Sen.Rep.No. 95–989, 95th Cong., 2d Sess. 54 (1978), U.S.Code Cong. & Admin. News 1978, p. 5840, and "in every case there is uncertainty that the estate will have sufficient property to pay administrative expenses in full." 124 Cong.Rec. H11,092 (daily ed., September 28, 1978).

Creditors also insisted that the valuation of collateral be open-ended, that a finding of value for one purpose and at one stage not be binding for other purposes and in other phases of a case, and that mistakes in valuation be remedied with a superpriority.

The reasons for these demands are instructive. Murphy, notes that interim payments are better than replacement liens as adequate protection "in that complete substitution [of collateral] is more appropriately incorporated in the plan of reorganization because a more careful inquiry into the fairness of the proposed substitution is possible at that time... Moreover, care must be taken to avoid giving too much or too little additional collateral, and the urgency and confusion of the first few days of a rehabilitation proceeding are hardly the time for the careful reflection necessary to do the job." Murphy, "Use of Collateral in Business Rehabilitations: A Suggested Redrafting of Section 7–203 of the Bankruptcy Reform Act," 63 Cal. L.Rev. 1483, 1504 (1975). Kennedy also notes that "[i]t is generally conceded that the value of property subject to a lien may change during the course of a case, and thus a finding of a particular value at one stage or for one purpose ought not to preclude a re-examination of the question when circumstances may have changed." Kennedy, *supra* at 256.

In short, creditors, aware of the perils of prognostication, and doubting the prescience of courts, were not satisfied with an administrative priority which might not materialize. Likewise aware that the exigencies of litigation and the vagaries of value further clouded this forecast, they insisted upon flexibility in valuation and a "fail-safe" superpriority. But this uncertainty is a double edged sword. Congress did not place the rights of creditors at the mercy of judicial speculation. But neither should the opportunities of others turn on crystal-gazing.

*Application to this Proceeding*

■ For the most part, this opinion has discussed what Section 362(d)(2)(B) does not mean. It does not embrace a rehabilitation test. But since most authorities have analyzed subpart (2)(B) according to a rehabilitation test, few have articulated criteria for a necessity test.[18]

Congress therefore removed the rehabilitation test from stay litigation and placed it in Section 1112(b)(1). Of course, a party who is willing to follow the procedures under Section 1112(b) and who is willing to forego his right to an accelerated hearing under Section 362(e) may combine a motion for dismissal with a request for relief from stay. If a motion to dismiss is brought with a request for relief from stay early in the case, the court, because it has discretion in the former but not the latter case, may account for the uncertainties of the test by postponing resolution of the same. Moreover, if there is no continuing loss, rehabilitation is irrelevant and relief denied. Similarly, if the test is applied, the court is aided by input from all parties in interest and analysis of their collective suffering in reorganization. *See also, supra* note 14, at 12–13.

**18.** In *In re Sulzer*, 2 B.R. 630 (Bkrtcy.S.D.N.Y. 1980), the court held that the home of a psychoanalyst which doubled as his office was "perhaps convenient, but not necessary" to an effective reorganization. *Id.* at 634. The court twice suggested that the home must be "unique" in order to be "necessary." Elsewhere it noted that the home was not property "without which the debtor cannot do business." *Id. See also, In re Gardner*, 14 B.R. 455 (Bkrtcy.E.D.Pa.1981) (home not necessary to effective reorganization where less expensive housing available). Similar rulings have been made under the Act. *See, e.g., Mundt v. Southland Savings and Loan Association of Chula Vista*, 354 F.2d 81 (9th Cir. 1968); *In re Tracy*, 194 F.Supp. 293 (N.D.Cal.1961). Uniqueness may not be the desideratum of Section 362(d)(2)(B). Property which is commonplace, such as the wrench of a mechanic, may nevertheless be necessary. The psychoanalyst needs an office. There is space other than his home, but this only begins analysis. Is it an affordable substitute, or will the change in location affect the estate in other respects?

The legislative history, detailed above, shows that Congress wrestled with the concept of need, first adopting and then rejecting certain formulas. One approach, espoused by spokesmen for the real estate lending community, distinguished between real property held for investment and used in a business. The latter, in their view, was necessary to reorganization while the former was not:

A realistic approach to deciding whether to continue a stay against the secured lender in Chapter XI would distinguish between real estate used in the debtor's business and real estate held or developed for investment. The underlying purpose of Chapter XI is rehabilitation. It encourages arrangements in order to give a business the opportunity for a second chance; to continue in operation, to keep its employees working and to reduce losses to creditors. Consistent with those aims, where the borrower uses real estate in its business, like a factory, warehouse, hotel, restaurant, motion picture theatre or farm and there, is no substantial damage to the secured lender, the court should try to keep the property available to the estate as long as there is a realistic chance for an arrangement that will result in a viable company. Indeed, even from the lender's point of view, the arrangement may be desirable for this kind of property because it may save the difference between the going concern value of the property and its liquidation value. On the other hand, different treatment should be accorded property developed or held for sale or investment where its use is not necessary to continue the debtor's business. This is true, as well, of properties held by a real estate developer whose business is constructing property for investment or sale rather than using the property so constructed in its business.

\* \* \* \* \* \*

The question may be raised why a real estate development company holding mortgaged property developed for rent should not be accorded the same treatment as a company which buys trailers on conditional sales contract and leases them out, *e.g., In re Bermec Corp.*, 445 F.2d 367 (2d Cir. 1971); *In re Yale Express System, Inc.*, 384 F.2d 990 (2d Cir. 1967). The essential differences are that the trailer business cannot continue without the trailers, but the development company can continue to build new buildings without owning the old ones. Moreover, the group of trailers as a whole have to be advertised, rented, maintained and controlled by the debtor. No one trailer can function as a business by itself. And without the trailers there is no going concern for the creditors, employees and community. By contrast, each individual real estate property can continue to function providing rental space to the community, taking in income, paying its employees, management and its own creditors. It operates as a self-contained business irrespective of who owns it. Even without the properties the debtor retains its going concern value as a developer of new real estate.

\* \* \* \* \* \*

The distinction advocated here between use-owned property and property created for

investment or sale, even where the latter is held by a developer, is not only consistent with the objectives of the Bankruptcy Act but also with the way the loan is viewed by the borrower and lender. When negotiating a mortgage on a factory, loft, store or like property owned by the borrower and used in his business, the parties recognize that generally the best use and maximum value of the property is in its use by and value to the particular business. The credit and future prospect of the borrower become significant factors in evaluating the loan. The lender is aware that if it improperly evaluates these factors, the property can be tied up in bankruptcy because it is integral to the borrower's business. The lender must, therefore, protect itself by dealing with a stronger credit or demanding a higher return for its risk than it would for a loan on investment property. By contrast, in the case of a loan on investment property, even though made to a professional developer who has more than one property under construction or ownership, the parties know that the mortgage lender is not looking to the credit of the owner but to the stream of income anticipated from the particular property itself. The owner is merely a conduit for payments on the mortgage. The property can change hands any number of times and the lender is usually not interested in the particular owner's qualities. Lifton, "Real Estate in Trouble: Lender's Remedies Need an Overhaul," 31 Bus.Law. 1927, 1951 and n.91 and 1953 (1976).

*See also, Senate Hearings, supra* at 705; Draper, "Stays of Mortgage Foreclosure—A Proposal For Reform," 93 Banking L.J. 133 (1976).

The investment-business test, however, was rejected by Congress, and therefore cannot be applied under Section 362(d)(2)(B). The Senate apparently endorsed the investment-business test when it added guidelines explaining "necessary to an effective reorganization." The Senate Report, however, remarked that this change was directed at single-asset tax-shelter investment cases and not investment property in general. It was not meant to cover "the operating shopping center ... where attempts at reorganization should be permitted." Sen.Rep.No.95–989, 95th Cong., 2d Sess. 53 (1978), U.S.Code Cong. & Admin.News 1978, p. 5839. Moreover, the guidelines were dropped because Section 362(d)(2)(B) "is not intended to apply if the business of the debtor is managing or leasing real property." 124 Cong.Rec. H11–092–11,093 (daily ed., September 28, 1978). Thus, the Senate Report evinced ambivalence over the test, and deletion of the guidelines, which had been aimed at investment property which was leased or managed, such as a shopping center, suggests a rejection of the test.

More important, however, the provisions for plans of liquidation undercut the test which, in essence, is a restatement of criteria for determining whether a business should be liquidated or rehabilitated: "[An] important .... factor inducing liquidation rather than reorganization is that the total value of the assets considered as individual items in separation is not greatly different from their value in the particular combination in which they happen to stand with reference to one another at the time of failure. An insurance company's investments in bonds, mortgages, etc., derive little or none of their worth from the fact that they happen to be contained in one portfolio; on the other hand, a railroad line is something more than a pile of steel rails, wooden sleepers, tieplates, and six inch spikes.... liquidation is called for in the [first] but reorganization in the [second]. Buchanan, The Economics of Corporate Enterprise 366–367 (1940). Proponents of the test argue that, since realty, like the bonds in the portfolio, may not gain in value from the circumstances of the enterprise, it should be foreclosed upon and liquidated. The provisions for plans of liquidation, however, make the choice between liquidation and rehabilitation, which was fundamental under the Act, irrelevant under the Code. So long as creditors receive adequate protection *and* grounds for dismissal are not present, debtors may wait for a sale which will maximize value to the estate.

A second approach centered on apartment buildings held as tax shelters by limited partnerships composed of wealthy individuals. It was believed that these entities should not be eligible for reorganization because their purpose in filing is less to reorganize than to prevent foreclosure which meant recapture of accelerated depreciation as ordinary income. Moreover, it was believed that the policies favoring reorganization were inapposite since, for the most part, there is no "business" in the conventional sense, other than operating the real estate, and therefore no threat of loss of production, employees, and other benefits to the community. To the extent jobs or taxes might be in jeopardy, foreclosure by the mortgagee and displacement of the debtor, in most cases, would work to recoup rather than accentuate these losses. Finally, the debt typically is concentrated in one or two lenders. The debtor is highly leveraged and has little or no capital of his own at risk. The gamble of reorganization, therefore, is borne by the lender, whose debt is transformed into equity, without the potential for gain which ordinarily follows this risk. *See Senate Hearings, supra* at 703–705 and 720–721; Nicholson, "Chapter XII: Rehabilitation or Resurrection? The Cram-Down and Other Problems," 26 Emory L.J. 489, 502–507 and 520 (1977). The merits of this second approach need not be addressed in this case, since among other reasons, debtors have multiple properties not a single asset, tax considerations did not enter into their calculus for filing, and overall, their equity is substantial.

■ A simple, workable test, which is faithful to the language of Section 362(d)(2)(B), and which implements the policy of maximum value for creditors is wanted. Accordingly, property in which the debtor has no equity is necessary to an effective reorganization whenever it is necessary, either in the operation of the business or in a plan, to further the interests of the estate through rehabilitation or liquidation. This test, in large measure, will turn upon the facts of each case. The property may be important to the liquidation of other property, as for example a warehouse or refrigerator which, although overencumbered, may be needed to store inventory or groceries pending sale.[19] The property standing alone may have no equity, but when sold as a package, may bring a better price for other assets, as for example, workings for watches yet to be assembled, or contiguous parcels of real property. Or the property may be sold for the direct benefit of junior lienors and the indirect benefit of unsecured creditors. Indeed, it may have no equity but may deserve the protection of the stay because, in order to continue operations, its value has been appropriated to supply adequate protection for others or pledged to secure postpetition credit.[20]

■ While further definition must await future cases, the home in this case is necessary to an effective reorganization. It has a net income. These earnings, by servicing the debt or reducing the lien to Empire, may create an equity in the home. They are available to satisfy obligations and build equities in the other property. The home may be sold or traded, alone or with other property, to the advantage of the estate. The home may be sold for the benefit of junior lienors, who therefore will not satisfy their claims from other property or the general fund; this leaves a proportionately larger equity for unsecured creditors and for debtors.[21] On this analysis, the home is

**19.** In this regard, the relation of Sections 362(d) and 363(e) may indicate that the former contains a necessity not a rehabilitation test. There are two grounds for relief from stay under Section 362(d), *viz.*, cause including a lack of adequate protection, and no equity plus no need, whereas there is one ground for conditioning the use of property under Section 363(e), *viz.*, adequate protection. The origin of a remedy, in Section 363(e), independent of Section 362(d), may be explained in Coogan, Broude, and Glatt, "Comments on Some Reorganization Provisions of the Pending Bankruptcy Bills," 30 Bus.Law. 1149, 1167 and 1176 (1975). It appears odd, however, that grounds for relief from stay and for conditioning the use of collateral are not identical, and indeed, both House and Senate Reports, commenting on Section 363(e), observe that "use of property in which an entity other than the estate has an interest may be effected only to the extent not inconsistent with any relief from the stay granted to that interest's holder." H.R.Rep.No. 95–595, 95th Cong., 1st Sess. 345 (1977); Sen. Rep.No.95–989, 95th Cong., 2d Sess. 55 (1978). Why would Congress permit the use of property, regardless of the prospects of rehabilitation, upon a showing of adequate protection under Section 363(e), but allow relief from the stay, because there are no prospects of rehabilitation, and notwithstanding a showing of adequate protection under Section 362(d)(2)(B)? This conundrum is resolved if the rehabilitation test is not important under either Section 363(e) or Section 362(d)(2)(B). Section 362(d)(2)(B) contains a necessity not a rehabilitation test. Section 363(e) does not restate this requirement because it is implicit in the use of property under that section. *See also*, 11 U.S.C. Section 542(a).

**20.** Collier and Murphy recognize the implications of Section 1123(b)(4) for Section 362(d)(2)(B). Nevertheless, they argue that, when there is equity in the property which, through liquidation, may be realized for the benefit of creditors, Section 1123(b)(4) complements Section 362(d)(2)(B), but where there is no equity in the property, liquidation is disallowed, and a rehabilitation test is appropriate. *See* 2 Collier on Bankruptcy, *supra* ¶ 362.07[3] at 362–51; P. Murphy, Creditors' Rights in Bankruptcy, Section 6.15 at 6–23—6–24 (1980). This may stretch the meaning of the statute too far, however. It is one thing to require a rehabilitation test under subpart (2)(B). It is another to read the test out of the statute when equity is present and back in when equity is absent. It is more plausible to believe that Congress selected the words and structured the statute so it could be understood without fudging. Moreover, a double reading of subpart (2)(B) does not account for the possibilities noted in the text.

**21.** In this case where there are many properties, absent allowance for marshaling for the benefit of junior lienors and unsecured creditors, the liquidating plan provisions may be meaningless. *Cf. Marine Harbor Properties, Inc. v. Manufacturers Trust Co.*, 317 U.S. 78,

necessary to an effective reorganization, and notwithstanding the absence of equity, and leaving undecided the prospect of rehabilitation, relief from the stay is denied.

86, 63 S.Ct. 93, 97, 87 L.Ed. 64 (1942) (dictum); *In re LaJolla Mortgage Fund*, 18 B.R. 283, 291 (Bkrtcy.S.D.Cal.1982). *But cf. In re Saint Peter's School*, CCH Bank.L.Rep. ¶ 68,535 (S.D. N.Y., January 12, 1982), where in a single asset case, the court would not approve a plan of liquidation which sold property for less than the aggregate liens in violation of 11 U.S.C. Section 363(f)(3). The parties in this case have not raised and the court does not reach this issue.