In re ASSOCIATED INVESTORS JOINT VENTURE f/d/b/a Registry Orange County Joint Venture d/b/a The Irvine Registry Hotel, Debtor.

HOMESTEAD SAVINGS & LOAN ASSOCIATION, Movant,

v.

ASSOCIATED INVESTORS JOINT VENTURE f/d/b/a Registry Orange County Joint Venture d/b/a The Irvine Registry Hotel, Debtor, Respondents.

Bankruptcy No. SA 87–06934 JR.
Ref. No. M8–0550 JR.

United States Bankruptcy Court,
C.D. California.

Aug. 11, 1988.

James J. Feder of Wyman, Bautzer, Kuchel & Silbert, Irvine, Ca., for debtor.

John A. Graham of Frandzel & Share, Los Angeles, Ca., for Homestead Sav. and Loan Ass'n.

## MEMORANDUM OPINION

JOHN E. RYAN, Bankruptcy Judge.

The proceeding before me is a motion for relief from the automatic stay under § 362(d) of the Bankruptcy Code (the "Motion") filed by Homestead Savings & Loan Association ("Homestead"). The preliminary hearing was held on April 13, 1988. At that hearing, I ordered the continuation of the stay pending a final hearing which the parties consented to be heard on June 16, 1988.

## JURISDICTION

This court has jurisdiction over this bankruptcy case pursuant to 28 U.S.C. § 1334(a) (the district courts shall have original and exclusive jurisdiction of all cases under Title 11), 28 U.S.C. § 157(a) (authorizing the district courts to refer all title 11 cases and proceedings to the bankruptcy judges for the district) and General Order No. 266, dated October 9, 1984 (referring all Title 11 cases and proceedings to the bankruptcy judges for the Central District of California). This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(G).

## DISCUSSION

Debtor operates the Irvine Registry Hotel in Irvine, California (the "Hotel"). The Hotel is strategically located across the street from the John Wayne Airport. The Hotel has 293 rooms and caters primarily to the commercial traveler doing business in Orange County. The Registry Hotel Corporation of Dallas, Texas (the "Registry") manages the Hotel. The Registry currently operates seven first-class hotels throughout the United States.

According to debtor, the Hotel was successful until the mid–1980s when a combination of factors caused the present financial difficulties resulting in the filing of the Chapter 11 petition on November 13, 1987. From 1983 to 1987, the number of competitive hotel rooms doubled, creating a substantial oversupply of rooms. In addition, debtor extensively renovated the Hotel from 1984 to 1986 seriously disrupting its operations. Despite this, debtor believes the future is bright because demand is projected to outstrip the supply of hotel rooms in Orange County. Debtor is currently implementing a new marketing plan to increase occupancy and the average room rentals.

Homestead is the primary lender on the Hotel with a secured debt inclusive of taxes and interest of $24,146,000. In response to debtor, Homestead points out that since 1983, the Hotel has experienced a sharp decline in occupancy from approximately 72% in 1983 to 50% in 1986. During the same period, the average daily room rental rate (the "ADR") has decreased from $80 to $72.50 per room. Although the occupancy level of the Hotel showed a minor increase in 1987 to approximately 54%, the ADR dropped to $63.25.

In June 1986, Homestead agreed to a short term reduction in loan payments to relieve debtor from its so-called "temporary" financial crisis. At the time, debtor represented that it would try to either sell the Hotel or obtain an infusion of capital. According to a June 13, 1986 letter from Mr. Charles Lanphere (a principal of debtor) to Homestead, debtor would "continue to actively pursue a joint venture partner". In December, 1986, a workout was arranged permitting debtor to make substantially reduced payments to Homestead through June, 1987. At the end of the forebearance period, Homestead rejected debtor's extension request. Since then, debtor has made no payments on the Homestead indebtedness.

Homestead alleges that debtor is mismanaging the Hotel. Despite the stiff competition, it believes the Hotel should be profitable. Instead, room revenues and gross operating income have substantially declined during the first five months of 1988 compared to a like period last year. Also, expenses have increased during the same period. For April and May, the projected net operating income was $58,251 compared to an actual loss of $68,831. Based on these facts, Homestead argues that reasonable deadlines should be set including a date certain by which a plan of arrangement is confirmed.

Debtor responds that sufficient equity exists in the Hotel to adequately protect Homestead. Furthermore, debtor has retained the services of Solomon Brothers, a respected investment banker, to either sell the Hotel or obtain equity funding. However, to accomplish this task, Solomon Brothers needs time. Debtor points out that if a "drop dead date" is fixed, Solomon Brothers will be hampered in maximizing the value of the Hotel. In support of its equity argument, debtor offered the appraisal of Pannell Kerr Forster ("PKF") through its partner Mr. Bruce Baltin. PFK valued the Hotel at $29 million. Debtor also had Mr. J. Pierce Cashman, a senior principal and director of valuation services for Levanthol and Horwath ("L & H"), an international accounting, tax and consulting firm, testify in support of the PKF appraisal.

Homestead submitted its own appraisal from Real Estate Research Corporation ("RERC") through the declaration and testimony of Ms. Sue Ann Dickey. RERC appraised the Hotel at $23.4 million.

I heard the Motion on June 15 and 17.

## DISCUSSION

In the Motion, Homestead moved for relief under § 362(d)(1) and (2). Section 362(d)(1) requires that relief from the stay be granted by "terminating, annulling, modifying, or conditioning such stay—(1) for cause, including the lack of adequate protection of an interest in property of such party in interest;". To establish cause, Homestead contends that debtor is mismanaging the Hotel. To support its view, debtor points to the deterioration in operating results since the bankruptcy filing.

The Registry manages the Hotel for debtor. The Registry successfully manages first-class hotels in other markets. Competition is acknowledged to be stiff in Orange County. Obviously, the Hotel has not recovered from the effects of an oversupply of hotel rooms and its renovation. However, debtor believes new marketing efforts will result in improved operations. I am not convinced that this will happen.

Yet, under the circumstances, I cannot find that the Registry is mismanaging the Hotel. Given an opportunity over the long term, the marketing strategies may prove successful. In any event, Homestead has not established cause to modify or condition the stay based on debtor's mismanagement of the Hotel.

Homestead next argues that the stay should be modified or conditioned under § 362(d)(2) because there is no equity in the Hotel and it is not necessary for an effective reorganization. Section 362(d)(2) provides that the stay may be modified or conditioned "with respect to a stay of an act against property under subsection (a) of this section, if—(A) the debtor does not have any equity in such property; and (B) such property is not necessary to an effective reorganization."

Turning to the first issue of equity, two divergent appraisals were admitted into evidence. After hearing the testimony of the appraisers, I accepted the PKF appraisal with certain modifications. The occupancy and ADR rates used by PFK and RERC were essentially the same for the ten year cycle used to value the Hotel based on the net income approach. However, the appraisers differed on the appropriate average room expense ratio used in calculating projected net income. Dickey employed a ratio of 28% while Baltin fixed the ratio at 19%. After reviewing industry trends and the Hotel's operating history, I concluded that the ratio should be 23%.

The appraisers also clashed on the future supply of rooms. Dickey included the Monarch Beach ("Monarch") and the Pelican Hill hotel ("Pelican Hill") projects in her universe. Baltin, on the other hand, excluded the Monarch and Pelican Hill rooms. After reviewing the information, I concluded that the Monarch and Pelican Hill hotels, if built, would not be competitive with the Hotel.

Lastly, I determined that a capitalization rate of 11% was more appropriate than the 10% rate used by PKF. Based on these changes, I had appraisers recalculate the PKF appraisal. The result was a value for the Hotel of $24,940,000.

As stated earlier, the outstanding indebtedness to Homestead, is $24,146,000. Interest alone accrues at approximately $200,000 per month. I calculated the costs of sale to be $685,850 based upon the Solomon Brothers fee of 2¾%. By deducting the indebtedness and the sales fee from $24,940,000, I found there was no realizable equity.

Since Homestead satisfied the first element of § 362(d)(2), I shall now turn to the issue of "necessity". Prior to the Supreme Court's decision in *United States Association of Texas v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. ——, 108 S.Ct. 626, 98 L.Ed 2d 740 (1988), courts generally approached § 362(d)(2) employing one of two divergent tests. For a detailed explanation of these tests, see *In re Planned Systems, Inc.*, 78 B.R. 852 (Bankr.S.D.Ohio 1987).

The minority view is the so-called "necessity test" developed by Judge Mabey in *In re Koopmans*, 22 B.R. 395 (Bankr.D.Utah 1982). Judge Mabey held that the phrase "effective reorganization" does not necessitate rehabilitation. *Id.* at 398. He concluded that a liquidation plan satisfies subpart (2)(B) just as well as a rehabilitation plan. He also rejected the incorporation of a feasibility test into § 362(d)(2)(B). He expressed the necessity test as "property in which the debtor has no equity is necessary to an effective reorganization whenever it is necessary, either in the operation of the business or in a plan, to further the interest of the estate through rehabilitation or liquidation." *Id.* at 407.

The majority view requires a showing of feasibility under § 362(d)(2). The feasibility test was first described in the *Matter of Terra Mar Associates*, 3 B.R. 462 (Bankr.D.Conn.1980). In *Terra Mar*, Judge Krechevsky concluded that properties are necessary to an effective reorganization only if "there is a reasonable possibility of a successful reorganization within a reasonable time." *Id.* at 466. The Supreme Court recently interpreted the language "necessary to an effective reorganization" in its *Timbers* opinion. *Supra* 484 U.S. at ——, 108 S.Ct. at 632, 98 L.Ed.2d at 751. The Court stated "What this requires is not merely a showing that if there is conceivably to be an effective reorganization, this property will be needed for it; but that the property is essential for an effective reorganization *that is in prospect.* This means, as many lower courts, including the en banc court in this case, have properly said, that there must be a "reasonable possibility of a successful reorganization within a reasonable time." *Id.* The Supreme Court, therefore, has adopted the majority view.

In footnote 14 to the Fifth Circuit's opinion in *Timbers*, 808 F.2d 363, 371 (5th Cir. 1987), the court recognized that "there may be circumstances under which the debtor is able to satisfy the 'effective reorganization' test of § 362(d)(2) by showing that the property at issue is necessary to an effective liquidation of the debtor under chapter 11, as distinguished from an effective rehabilitation of debtor." In *Planned Systems, supra,* Judge Cole had a liquidation plan before him. He adopted the majority view requiring a showing of feasibility, but agreed with Judge Mabey that a liquidation plan is encompassed within the meaning of "effective reorganization". He expressed the test as "a reasonable possibility that a successful rehabilitation or a successful liquidation can be accomplished within a reasonable period of time and that the property in question will contribute to this effect." *Id.* at 866.

I choose to follow the view that a liquidation plan may satisfy the necessity element of § 362(d)(2)(B). This is important here because the evidence shows that a sale of the Hotel is the most likely option available to debtor.

Solomon Brothers has been retained and instructed to seek a buyer for the Hotel. Debtor has, without success, already attempted to attract prospective joint venture partners into providing capital for the continued operation of the Hotel. However, I have no reason to believe that Solomon Brothers will be able to find an angel to save the Hotel for debtor especially in light of the continued deterioration in operations.

Homestead has not asked for termination of the automatic stay. If it had, I might have granted the request. Generally, in a single asset case where there is no equity in the property, the stay should not be continued based on the debtor's hope that a beneficial liquidation plan can be achieved. I need not face that issue because Homestead asks for the stay to be *modified or conditioned* by setting a reasonable deadline for a plan.

Faced, therefore, with the likelihood of a liquidation plan, the question is how much time should I give debtor to find a buyer. This is not a situation where the asset is retained and sold with other assets thereby adding value to the whole. This is a single asset case. I have already held that there is no equity in the Hotel. In giving the Hotel additional time, I am effectively delaying Homestead's realization on its collateral based on the chance that the Hotel can be sold at a purchase price greater than my finding of value. I am willing to do it in light of Homestead's request for a reasonable deadline.

An additional concern is the continued deterioration in operations and the likelihood that Homestead's cash collateral may be absorbed just to keep the doors of the Hotel open. I dealt with that issue in a separate cash collateral hearing in which I required the posting of a certificate of deposit (the "bond") to adequately protect Homestead against the diminution of its cash collateral. The bond has to be posted and is a condition to the continuation of the automatic stay.

Accordingly, the automatic stay shall terminate effective October 31, 1988. This is the minimum time Solomon Brothers indicated it needed to find a buyer for the Hotel. Debtor may bring a motion for continuation of the stay beyond October 31, 1988, if cause so justifies. Additionally, the stay will terminate if the bond is not posted.

Separate findings of fact and conclusions of law with respect to this ruling are unnecessary. The within memorandum opinion shall constitute my findings of fact and conclusions of law.