In re SOONER OIL & GAS CORPORATION, Debtor.

Murray COHEN, Trustee, Plaintiff,

v.

GREAT GUNS, INC., A Corporation, and Citizens National Bank & Trust Co., Oklahoma City, Oklahoma, Defendants.

Bankruptcy No. BK–82–103.
Adv. No. 82–0069.

United States Bankruptcy Court, W.D. Oklahoma.

Nov. 9, 1982.

B.J. Brockett, Oklahoma City, Okl., for plaintiff-movant, Murray Cohen, trustee in bankruptcy.

Martin W. Bauer, Wichita, Kan., and Sally E. Scott, Oklahoma City, Okl., for defendant-movant, Great Guns, Inc.

Jerry L. Hemry, Oklahoma City, Okl., for defendant, Citizens Nat. Bank.

## MEMORANDUM OPINION AND ORDER

ROBERT L. BERRY, Bankruptcy Judge.

*Statement of the Case*

This matter is before the court on motions for partial summary judgment submitted by the defendant, Great Guns, Inc., and the plaintiff, Murray Cohen, trustee in bankruptcy, against the defendant, Citizens National Bank. All three parties herein claim an interest in a certain oil well servicing unit referred to as a perforating truck. Both Great Guns, Inc., and Citizens National Bank claim superior perfected security interests in the truck which are disputed by the trustee.

*Facts*

On August 13, 1980, the Chevrolet Motor Division of General Motors Corporation issued a certificate of origin to Hudiburg Chevrolet Inc. of Fort Worth, Texas relating to a 1980 4½ ton Chevrolet truck with Identification No. C17DBAV154676.

On December 3, 1980, Gearhart-Owen Industries, Inc. of Fort Worth, Texas, issued a price quotation to Sooner Oil & Gas Corp. for the sale and installation of well logging and surface electronics F/Perforators. This equipment was to be installed on a chevrolet truck, Model CC7D042 for use in oil and gas operations.

On or about May 4, 1981, Hudiburg Chevrolet assigned a Model CC7D042 truck to Gearhart-Owen Industries, Inc., for the incorporation of the equipment onto the truck. No lien was shown as of the date of the assignment.

On June 30, 1981, Citizens National Bank loaned Sooner Oil & Gas Corp. $110,000.00.

On July 7, 1981, Citizens National Bank filed a financing statement with the County Clerk of Oklahoma County, Oklahoma, listing Sooner Oil & Gas Corp. as the debtor and the Gearhart-Owen Perforating truck and equipment as collateral. No other financing statement was filed by the Citizens National Bank.

On or about July 22, 1981, Gearhart Industries, Inc. assigned the Certificate of Origin to LRM Servicing Company. No lien was shown as of the date of the assignment.

On or about July 22, 1981, Sooner Oil & Gas Corp. was indebted to Great Guns, Inc. in the approximate amount of $204,981.48, with said sum due on open account for services performed by Great Guns, Inc. prior to that date. Larry R. McDaniel, who is the president of LRM Servicing Company and Sooner Oil & Gas Corp., authorized Great Guns, Inc. to take possession of the electronic gear, perforating equipment and truck upon which the equipment was installed. LRM Servicing Company and Sooner Oil & Gas Corp. have never had physical possession of the electronic gear, perforating equipment and truck upon which it is mounted. On or about July 22, 1981, Great Guns, Inc. took possession of the truck at Fort Worth, Texas, and has remained in continuous possession of the truck since that date.

Great Guns, Inc. has reduced the indebtedness of Sooner Oil & Gas Corp. in the amount of $3,712.50 per month since August 1, 1981, said amount being the reasonable rental value of the perforating truck.

From July 22, 1981, to the present, the perforating truck has not been in the State of Oklahoma and has been exclusively used on various drill sites in the State of Kansas and driven over the public thoroughfares of the State of Kansas on a day-to-day basis. From November 22, 1981, to the present, Citizens National Bank has filed no financing statement in the State of Kansas involving either Sooner Oil & Gas Corp. or LRM Servicing Co. nor has it ever had its claimed lien noted upon a Certificate of Title relating to the perforating truck.

An application was submitted for a State of Kansas Certificate of Title on January 11, 1982, and a Certificate of Title was issued by the State of Kansas on January

21, 1982, showing LRM Servicing Co. as the owner of the vehicle and Great Guns, Inc. as a secured lienholder. Citizens National Bank was not listed as a lienholder upon the Certificate of Title.

With regard to the relationships between himself, Sooner Oil & Gas Corp. and LRM Servicing Co. and the circumstances surrounding the perforating truck transaction, Larry McDaniel testified by deposition on June 25, 1981, as follows:

Q. Would you state your name and business address?

A. Larry R. McDaniel. . . .

\* \* \* \* \* \*

Q. What position do you hold with Sooner Oil and Gas?

A. I am president and owner of Sooner Oil and Gas.

Q. Are you hundred percent owner?

A. Hundred percent owner.

Q. What is the relationship, if any, between Sooner Oil and Gas and LRM?

A. They are kind of intertwined. Sooner would be—LRM Servicing would be—is owned by Sooner.

Q. So is it correct to assume that Sooner Oil and Gas owns the stock of LRM?

A. No.

Q. Who owns the stock?

A. I do.

Q. Do you own that one hundred percent?

A. Yes.

\* \* \* \* \* \*

Q. When did Sooner Oil and Gas or LRM decide to purchase a perforating truck?

A. We decided about a year before we did so I don't know the dates.

Q. Who made the decision?

A. I did.

\* \* \* \* \* \*

Q. As a result of your decision to purchase the truck what financing arrangements did you make for its purchase?

A. We went and borrowed the money at the bank.

Q. Which bank are you referring to?

A. Citizens National Bank.

\* \* \* \* \* \*

Q. Did you discuss with Mr. Zahn your proposed use of the truck?

A. Yes.

Q. Did you indicate where you intended to use the perforating truck?

A. Yes.

Q. Where did you indicate it would be used?

A. Mostly on our own wells.

Q. Where are your wells located?

A. Okmulgee County, Muskogee County, Creek County.

Q. All within the boundaries of Oklahoma?

A. Yes.

\* \* \* \* \* \*

Q. At about the time that you were notified that the truck was ready had you been having conversation with Great Guns regarding your indebtedness to them?

A. Yes.

Q. What was the approximate amount of the indebtedness at that time?

A. Hundred and seventy, hundred and eighty, hundred and ninety thousand dollars.

\* \* \* \* \* \*

Q. Was there discussion about methods by which the indebtedness between Sooner and Great Guns could be reduced?

A. Yes.

Q. What was the nature of those discussions?

A. We had lots of different discussions. Our main thing was to—we were selling production to pay Great Guns off and some other people. Then we made the deal on the perforating truck. You want to go through all—

Q. Yes, that is exactly where I want to be.

A. So we had made the deal on the perforating truck and by the time we had paid for the perforating truck it was delivered I think forty-five days later or so.

Q. Was it ready for delivery forty-five days later?

A. Was it ready for delivery?

Q. Specifically did Sooner Oil and Gas ever have the perforating truck in its possession?

A. No.

Q. When you say it was delivered I want to be sure—

A. It was ready for delivery.

Q. Thank you.

A. It was ready for delivery. We were expecting around three or four or five hundred thousand dollars from Blinder.

Q. Had you made that known to Mr. Davis [Dale Davis, president of Great Guns, Inc.]?

A. Yes.

Q. Continue, I am trying to—

A. We made a deal with Dale, he was going to pay us, I am not sure about the figures, I think a hundred twenty-five, hundred thirty-five. He was giving us twenty or twenty-five thousand more for the perforating truck against our bill and we were to pay off the bank with the money that came in from Blinder to get it clear for Dale.

\* \* \* \* \* \*

Q. How was the hundred and thirty-five thousand dollars to be handled?

A. It was to be handled—taken off the bill when we paid the truck off and in the mean time Dale was going to rent the truck because we figured it was going to take about sixty days to get our money.

\* \* \* \* \* \*

Q. As a result of those conversations did you give authority for Great Guns to take possession of the truck?

A. Yes.

\* \* \* \* \* \*

Q. The quote which is Great Guns Exhibit Four is in the name of Sooner Oil and Gas Corporation but the Certificate of Origin is in the name of LRM. Why did you have the Certificate of Origin initiated in the name of LRM?

A. Because it was our servicing company and Sooner Oil and Gas and LRM Servicing are so intertwined it really didn't matter. It could have gone into Sooner and it could have gone into LRM Servicing.

Q. Even though you placed it in the name of LRM you intended to convey it to Great Guns in satisfaction of Sooner Oil and Gas' debt to Great Guns?

A. Yes.

\* \* \* \* \* \*

Q. That's all on that item. You testified that Sooner Oil and Gas, LRM Servicing were intertwined?

A. Yes.

Q. Would you define that for us, please, what do you mean by intertwined?

A. Well, we were doing business in Sooner and LRM Servicing and if we needed money we got it from Sooner or LRM Servicing, they were just pretty well one, I would say one business.

Q. Were their affairs pretty well mixed up?

A. Yes.

Q. Between the two entities?

A. Yes.

Q. Did they ever use money of one to pay obligations of the other?

A. Yes.

Q. Did they ever use equipment of one for the benefit of the other?

A. Yes.

On January 20, 1982, Sooner Oil & Gas Corp. and LRM Servicing Co. filed a petition under Chapter 11 of the Bankruptcy Code.

*Law*

One of the issues presented in this case is the question of whether the perforating truck is to be considered "special mobilized machinery" as defined in 47 Okl.St.Ann. § 22.1(27).

■ In the accompanying brief in support of its Motion for Partial Summary Judgment, Great Guns, Inc. first maintains that the bank's security interest never attached. Under 12A Okl.St.Ann. § 9–203 and former 12A Okl.St.Ann. § 9–204, a security interest attaches when there is a security agreement between the parties, value is given and the debtor acquires rights in the collateral. Great Guns, Inc. does not dispute the first two requirements but does contend that the debtor never acquired rights in the collateral. Great Guns' contention is based on the fact that the financing statement filed by the bank listed Sooner Oil and Gas, Corp. as the debtor while the truck's Certificate of Origin was assigned to LRM Servicing Co. Great Guns also emphasizes the fact that Sooner Oil & Gas Corp., itself, never had physical possession of the truck.

As stated in *Adkisson v. Waitman,* 202 Okl. 309, 213 P.2d 465 (1950):

> "The certificate of title to an automobile issued under a motor vehicle code is not a muniment of title which establishes ownership, but is merely intended to protect the public against theft and to facilitate recovery of stolen automobiles and otherwise aid the State in enforcement of its regulation of motor vehicles. [Citations omitted.]"

■ It is true that LRM Servicing Co. and Sooner Oil and Gas Corp. were two separate corporations. It is also true, however, that the notion of corporate existence of parent and subsidiary or affiliated corporations will not be recognized where one corporation is so organized and controlled and its business conducted in such a manner as to make it merely an agency, instrumentality, adjunct, or alter ego of another corporation. See 18 Am.Jur.2d, Corporations § 17.

In *Mid-Continent Life Ins. Co. v. Goforth,* 193 Okl. 314, 143 P.2d 154 (1943), a land company owned land subject to a mortgage held by an insurance company. A contract of sale for the land was then entered into between the land company and a buyer. In order to partially finance the transaction, the buyer executed a note and mortgage in favor of the insurance company who, in turn, paid the amount borrowed directly to the land company. On appeal from a subsequent foreclosure action, the Oklahoma Supreme Court said:

> "The land company and the insurance company are separate, corporate entities. It is the general rule that a corporation is an entity separate and apart from the persons composing it, but the rule has its limitations. Both law and equity, when necessary to circumvent fraud, protect the rights of third persons, and accomplish justice, disregard the distinct existence and treat them as identical. *Caldwell v. Roach,* 44 Wyo. 319, 12 P.2d 376. The doctrine that a corporation is a legal entity, separate and apart from the persons composing it, is a legal theory introduced for purposes of convenience and to subserve the ends of justice, but the concept will not be extended to a point beyond its reason and policy, and when invoked in support of an end subversive of said policy will be disregarded by the courts . . . .

> "It is clear that the parties, by their acts and conduct, have treated the transactions for the sale of the land and for the loan of the money as a single transaction, and for the purpose of this opinion the contract of sale and the note and mortgage will be treated as a single instrument, and the theory that the respective corporations are legal entities and separate and distinct from the persons composing them will be disregarded. There is no contention that the parties who negotiated the transactions involved herein were without authority to bind the respective corporations."

■ In the instant case, a loan was negotiated between the Citizens National Bank and Larry McDaniel for Sooner Oil and Gas Corp., a corporation solely owned and managed by him, for the purchase of a perforating truck. In connection with this loan, there can be no question that the bank intended to receive, and McDaniel intended to convey, a security interest in the truck.

This Court cannot equitably allow the bank's security interest, as between the parties, to be defeated by the mere fact that McDaniel chose to have the truck's Certificate of Origin assigned to LRM Servicing Co., another corporation solely owned and managed by him, and whose affairs were so "intertwined" with those of Sooner that both corporations were, to use McDaniel's own words, "one business".

Having determined that a security interest in the truck did attach in favor of the bank as between the parties, this Court now faces the issue of perfection of that security interest. 47 Okl.St.Ann. § 23.2b(A)(1) provides:

"Except for a security interest in vehicles held by a dealer for sale or lease, as defined in Section 1–112 of this title, a security interest, as defined in Section 1–201 of Title 12A of the Oklahoma Statutes, in a vehicle as to which a certificate of title may be properly issued by the Tax Commission shall be perfected only when a lien entry form, which shall be upon a form prescribed by the Commission, and the existing certificate of title, if any, or application for a certificate of title and manufacturer's certificate of origin containing the name and address of the secured party and the date of the security agreement and the required fee are delivered to the Oklahoma Tax Commission or one of its motor license agents. For purposes of this section, the term 'vehicle' shall not include special mobilized machinery, machinery used in highway construction or road material construction and rubber-tired road construction vehicles including rubber-tired cranes. The filing provisions of Title 12A of the Oklahoma Statutes, including, but not limited to, Section 9–302, shall not be applicable to perfection of security interests in vehicles as to which a certificate of title may be properly issued by the Tax Commission, except as to vehicles held by a dealer for sale or lease and except as provided in subsection D of this section."

■ Great Guns maintains that even if a security interest did attach in favor of the bank, that security interest remained unperfected because the bank did not take the proper steps to perfect it in accordance with the above quoted section. The bank, on the other hand, argues that the truck falls within the "special mobilized machinery" exception to that section and, hence, its security interest has been validly perfected in accordance with the Commercial Code. The term "special mobilized machinery" is defined in 47 Okl.St.Ann. § 22.1(27):

" 'Special mobilized machinery' means special purpose machines, either self-propelled or drawn as trailers or semitrailers, which derive no revenue from the transportation of persons or property, whose use of the highway is only incidental, and whose useful revenue producing service is performed at destinations in an area away from the travelled surface of an established open highway;"

The term "truck" is defined in 47 Okl.St. Ann. § 22.1(32):

" 'Truck' means every motor vehicle of the truck type constructed or used for the transportation or delivery of property and all other motor vehicles of the truck type used for any commercial or industrial purposes *including oil well servicing units.* This does not include vehicles of the passenger type that occasionally transport personal property. This includes all motor vehicles constructed and especially equipped for use in connection with any construction work or agricultural or mining enterprises." (Emphasis added.)

Given these two definitions, the question arises as to whether the specific inclusion of oil well servicing units in the definition of the term "truck" should operate to exclude oil well servicing units from the term "special mobilized machinery". This Court is of the opinion that it does. As stated in *Corn Products Refining Company v. Benson,* 232 F.2d 554 (2d Cir.1956), "Where such a provision has been carefully included in one place and excluded in another place in a definitional statutory provision, it should not be implied in the place omitted."

In *Halliburton Company v. Property Appraisal Dept.,* 88 N.M. 476, 542 P.2d 56 (1975), the Court of Appeals of New Mexico was faced with the question of whether an oil well servicing vehicle was special mobile equipment as defined by a New Mexico statute. The court said:

"... Special mobile equipment is defined in § 64–1–12, N.M.S.A.1953 (2d Repl.Vol. 9, pt. 2). *Gibbons & Reed Company v. Bureau of Revenue,* 80 N.M. 462, 457 P.2d 710 (1969). This definition reads in part: 'Every vehicle not designed or used primarily for the transportation of persons or property and incidentally operated or moved over the highways * * *'

"The evidence is undisputed that the equipment in question is added to the chassis for the purpose carrying that equipment to and from drilling sites over the highways. 'Incidental' means subordinate, nonessential, as occurring merely by chance or without intention or calculation. Webster's Third New International Dictionary (1966). The evidence is that the equipment was not incidentally moved over the highways: the equipment is not special mobile mobile equipment under § 64–1–12, supra."

 Having decided that the perforating truck is not "special mobilized machinery" within the meaning of 47 Okl.St.Ann. § 22.1(27) and 47 Okl.St.Ann. § 23.2b(A)(1), this Court is forced to conclude that the bank's security interest in the truck is not perfected for failure to comply with the provisions of § 23.2b which specifies the *only* means for perfection of security interests in motor vehicles in Oklahoma. Since the bank's security interest is unperfected, such interest would be subordinate to any security interest which Great Guns might have if perfected, or if not, to the trustee in bankruptcy.

#### Conclusion

In consideration of the foregoing facts and authorities, it is this Court's opinion that the motions for partial summary judgment submitted by the defendant Great Guns, Inc. and the trustee against the Citizens National Bank should be, and are hereby, granted.

IT IS SO ORDERED.