**In re AMAREX, INC., Debtor.**

**TWELVE PERCENT SECURED NOTE-HOLDERS and Continental Illinois National Bank & Trust Company of Chicago, Trustee, Plaintiffs,**

v.

**AMAREX, INC., Defendant.**

**Bankruptcy No. Bk–82–02335.
Adv. No. 82–0182.**

United States Bankruptcy Court,
W.D. Oklahoma.

June 20, 1983.

Edith H. Jones and Hugh M. Ray of Andrews & Kurth, Houston, Tex., Fred E. Weinberg, Daniel A. Zimmerman and David M. Friedman of Finley, Kumble, Wagner, Heine, Underberg & Casey, New York City, and Richard F. Campbell of Fellers, Snider, Blankenship, Bailey & Tippens, Oklahoma City, Okl., for Twelve Percent Secured Noteholders.

David Curry of Mayer, Brown & Platt, Chicago, Ill., for Continental Ill. Nat. Bank & Trust Co. of Chicago.

David Kline of Kline & Kline, Oklahoma City, Okl., Robert O. Isaac, Gen. Counsel, Amarex, Inc., Houston, Tex., John L. King of Rochelle, King & Balzersen, Dallas, Tex., and Jerome W. Johnson of Underwood, Wilson, Berry, Stein & Johnson, Amarillo, Tex., for Amarex, Inc.

Frank R. Monroe and Patrick L. Hughes of Sheinfeld, Maley & Kay, Houston, Tex., for amicus curiae.

## DECISION

RICHARD L. BOHANON, Bankruptcy Judge.

This matter has been heard upon the complaint of the plaintiffs, Twelve Percent Noteholders,[1] seeking to terminate the automatic stay or a judgment declaring that the stay does not apply. The Noteholders want possession of some $2.4 million held by the bank-trustee in partial payment of obligations of the debtor in possession, Amarex, Inc., to the Noteholders. The court has heard arguments of counsel for the parties, reviewed briefs, including one filed *amicus curiae* by certain banks and has taken testimony.

Amarex is engaged in the business of exploring for and producing oil and gas. As general partner of numerous limited partnerships, it operates oil and gas wells and manages the partnerships. In very general terms the limited partners pay the costs of drilling the wells and Amarex pays the costs of their completion. The funds in question were raised through private offering to be available as needed by Amarex to pay its share of the costs. As used, the funds would be paid back out of 75% of Amarex's interest in particular partnerships.

This adversary proceeding was commenced on March 25, 1983, by plaintiffs' complaint to terminate the automatic stay of 11 U.S.C. § 362(a). Amarex answered on April 11, 1983, and the case was tried on April 19, 1983. After termination of the

---

1. This group has not been certified as a class nor are the members individually identified. However, no question has been raised as to their standing as a group.

automatic stay under 11 U.S.C. § 362(e) the court reinstituted a stay against the Noteholders until June 19, 1983 pending final determination, under 11 U.S.C. § 105(a).[2]

The Noteholders purchased Amarex's notes in the principal amount of $60.5 million commencing in June, 1980. Continental Illinois National Bank and Trust Company of Chicago, serves as trustee for disbursement of the proceeds of the notes to Amarex and collection of payments from Amarex.

Amarex and the trustee, on behalf of the Noteholders, entered into a security agreement and a Note Purchase Agreement. These agreements and related documents obligated the Noteholders to purchase the notes from Amarex, with the proceeds to be held by the trustee until used by Amarex as agreed among the parties. At the time of filing for reorganization under Chapter 11 the trustee held undistributed approximately $2.4 million in the note fund.

Following execution of the Note Purchase Agreement and the Security Agreement, a number of closings occurred until the Noteholders had purchased all the secured notes.

Amarex periodically withdrew money from the fund only after demonstrating to the trustee that (1) it had incurred "productive well costs" (defined by the agreements), and (2) that no event of default pursuant to the Note Purchase Agreement had occurred. The Security Agreement requires that upon completion of all drilling and development activities of certain limited partnerships or on December 31, 1984, whichever is earlier, any proceeds from the sale of the secured notes shall be applied to prepayment of obligations then owed by Amarex.

The Security Agreement grants the Noteholders a security interest in 75% of Amarex's "Total Production Net Revenues" as general partner of Amarex Private Drilling Program, Ltd.-1979, Amarex Private Drilling Program, Ltd.-1980 and Amarex Private Drilling Programs, Ltd.-1980–2, all limited partnership drilling programs. Any proceeds, profits, products or other property interest arising or resulting from or related to the collateral are also pledged.

The Security Agreement outlines specific procedures in event of default and directs the trustee, at the time of default, to apply the note fund as prepayment.

Upon the filing of its bankruptcy petition, Amarex was in default for failure to pay installments of interest due and has remained in default. By terms of the agreements, Amarex cannot draw down additional note funds without either curing the defaulted interest payments or obtaining a waiver from the Noteholders. The past due interest has not been waived nor have any offers of waiver been brought before the Court. Due to these circumstances, Amarex is in a position of having to pay approximately $3.6 million in past-due interest in order to obtain use of the remaining $2.4 million note fund if, at a future date, it incurs productive well costs. And, interest accrues at the rate of some $600,000 per month.

The Noteholders' complaint for relief from the stay is premised on four inter-related theories. They allege Amarex (1) cannot assume the contracts, for assumption of an executory contract to borrow money is prohibited, (2) the note funds are not property of the estate, (3) Amarex has no equity in the note funds and such property is not necessary to an effective reorganization, and (4) they are not adequately protected due to the unavailability of the fund to reduce obligations owed by Amarex.

■ Amarex contends the Noteholders do not have a security interest in the remaining $2.4 million and, therefore, may not complain for its return. The issue is, however, whether or not the Noteholders

---

**2.** The preliminary hearing was held on April 19, 1983, and no final hearing was commenced within 30 days. 11 U.S.C. § 362(e). The automatic stay thus terminated on May 19th since no order was entered continuing it. However, under powers provided by 11 U.S.C. § 105(a) the Court issued its stay order against the Noteholders.

have standing to seek termination of the stay. They do for they are parties in interest and nothing in 11 U.S.C. § 362(d) requires that a moving party first have a lien upon property of the estate in order to seek the remedy.

In deciding whether to terminate the stay imposed by this Court under 11 U.S.C. § 105(a) we consider the same issues as though dealing with termination under 11 U.S.C. § 362(d). Therefore, we must look to see if the debtor has equity in the property and the necessity of the property to an effective reorganization, or the existence of other cause for relief from the stay. *See In re Regency Woods Apartments, Ltd.,* 686 F.2d 899, 902 (11th Cir.1982). The Noteholders have the burden of proof only on the issue of the debtor's equity in the property and Amarex has the burden on all other issues. 11 U.S.C. § 362(g).

The legislative history of 11 U.S.C. § 362 indicates that the facts of each request for relief from the stay will determine whether relief is appropriate under the circumstances. See House Report No. 595, 95th Cong., 1st Sess. (1977) 34 3–4; U.S.Code Cong. & Admin.News 1978, p. 5787.

■ In determining whether the debtor has equity in the property in question the court may consider all types of restrictions against use of the property. *In re McCall,* 25 B.R. 199 (Bkrtcy.E.D.Pa.1982). We also need to construe the agreements where they are important to the issue of equity. *In re Bialac,* 694 F.2d 625 (9th Cir.1982). The agreements entered into by the parties place various restrictions on the use of note funds and make it highly unlikely for Amarex to ever have access to the remaining funds.

All defaults under the agreements must be cured before Amarex could draw down any funds, absent waiver. In order to use the $2.4 million Amarex would need to pay approximately $3.6 million in past due interest or obtain a waiver. Moreover, there is no indication that the Noteholders intend to waive the various default provisions under the agreements. There is little question that not only does Amarex have no equity

in the $2.4 million, but even access to the fund is tenuous at best.

The Security Agreement also indicates that Amarex could have no equity in the note fund. It provides:

"If any event of default shall have occurred and be continuing, the Trustee may exercise on behalf of the holders of secured notes all the rights and remedies of a secured creditor under the Uniform Commercial Code . . . and . . . (1) *apply the cash, if any, then held by it as collateral . . .*"

The language "then held by it as collateral" must refer to any note funds held at the time of default. Consequently, upon default the Security Agreement operates to terminate Amarex's possible equity in the note fund. We see no justification to hold the remaining $2.4 million in suspense when the debtor's chances of using the funds are remote.

■ However, a finding of no equity in the property is insufficient, standing alone, for this Court to grant relief from the stay. We must also find that the property is not necessary for the debtor's effective reorganization. The debtor is virtually crippled in its attempt to use the $2.4 million for reasons already mentioned. In addition, the debtor has not presented a plan of reorganization within its exclusive period allowed by 11 U.S.C. § 1121.

■ Few cases have articulated criteria for when property is considered necessary for an effective reorganization. Even fewer have focused on what is meant by "necessary." One court has stated the standard is that "[p]roperty in which the debtor has no equity is necessary to an effective reorganization whenever it is necessary, either in the operation of the business or in a plan, to further the interests of the estate through rehabilitation or liquidation." *In re Koopmans,* 22 B.R. 395, 407 (Bkrtcy.D. Utah 1982). Also, *property may be useful or convenient in reorganization and still not be necessary. In re Sulzer,* 2 B.R. 630 (Bkrtcy.S.D.N.Y.1980). Other courts say "it is not enough for a debtor to argue that the

... stay should continue because it needs the secured property in order to propose a reorganization." *La Jolla Mortg. Fund v. Rancho El Cajon Associates,* 18 B.R. 283, 291 (Bkrtcy.S.D.Cal.1982) (citing *In re Clark Tech Associates, Ltd.,* 9 B.R. 738 (Bkrtcy. Conn.1981)). Still other courts have held that "[t]here must be a showing by the debtor that the property is '*essential*' to an effective reorganization" to be considered "necessary". *In re Mikole Developers, Inc.,* 14 B.R. 524, 525 (Bkrtcy.E.D.Pa.1981). Since all debtors who resist a request for relief from the stay may regard all their assets as indispensable, § 362(d) must require more than a mere assertion that the property is needed or could be helpful.

We feel that the term "necessary" requires the court to find that the property is essential, in light of all the circumstances, to an effective reorganization of the estate.[3] This fact must be ascertainable at the time of the consideration to continue the stay and a clear showing must be made. The debtor has only shown that the funds may be useful, but no absolute need has been demonstrated. Failure on the part of the debtor to gain use of these funds would not, standing alone, clearly frustrate its chances of reorganization. *Cf. In re Pilson,* 9 CBC 424 (Bkrtcy.W.D.Va.1976); *BVA Credit Corp. v. Consolidated Motor Inns,* 6 CBC 18 (Bkrtcy.N.D.Ga.1975); *In the Matter of Bric of America, Inc.,* 4 CBC 34 (Bkrtcy.M. D.Fla.1975); *In re Atlantic Steel Prod. Corp.,* 31 F.Supp. 408 (E.D.N.Y.1939). A showing that the property might be needed, at an indeterminable future date, or hopes of possibly gaining access to the property is insufficient.

In the instant case the debtor has failed to sustain its burden of showing that the note fund is necessary for an effective reorganization. Moreover, it has not persuaded the court that there is a likelihood of its ever being able to have access to the fund. Although the court has power to deny the Noteholders' application of those funds, we think it would be inequitable, under the present circumstances, to do so. A bankruptcy court is a court of equity which may, in its discretion, deny relief which is within its powers or grant relief upon some condition dictated by equitable principles. *In re Tracy,* 194 F.Supp. 293, 295 (D.N.D.Cal. 1961). Upon these facts and for the foregoing reasons the stay imposed by the Court pursuant to 11 U.S.C. § 105(a) should be terminated.

Our holding above is dispositive of the complaint. Therefore, the additional arguments raised by the plaintiffs such as the note funds are not property of the estate, adequate protection and whether the agreements amount to unassumable executory contracts to make a loan, need not be addressed.

Accordingly, the judicially imposed stay will be terminated to permit the trustee to disburse the note funds pursuant to the agreements.

Pursuant to B.R. 752 this Decision constitutes the findings of fact and conclusions of law.

An appropriate judgment will be entered.

---

**3.** The schedules state that Amarex's total assets have a value of almost $309 million. The $2.4 million is only .8% of that amount.