In re RAMCO WELL SERVICE, INC., Debtor.

The CHASE MANHATTAN BANK, N.A., Plaintiff,

v.

RAMCO WELL SERVICE, INC., Defendant.

In re RAMCO EQUIPMENT, LTD., INC., Debtor.

The CHASE MANHATTAN BANK, N.A., Plaintiff,

v.

RAMCO EQUIPMENT, LTD., 1981–1, Defendant.

Bankruptcy Nos. BK–83–00529–A, BK–83–00605–A.

Adv. Nos. 83–0455, 83–0454.

United States Bankruptcy Court, W.D. Oklahoma.

Aug. 11, 1983.

Charles A. Grissom, Jr. of Boesche, McDermott & Eskridge, Tulsa, Okl. for plaintiff, The Chase Manhattan Bank, N.A.

David Kline and Stephen W. Elliott of Kline & Kline, Oklahoma City, Okl., for debtor-defendant Ramco Well Service, Inc.

Paul Tobin of Cohen & Pluess, Oklahoma City, Okl. for debtor-defendant, Ramco Equipment Ltd., 1981–1.

## MEMORANDUM OF DECISION

RICHARD L. BOHANON, Bankruptcy Judge.

Chase Manhattan Bank, N.A. participated in loans to defendants Ramco with the defunct Penn Square Bank, N.A. of Oklahoma City. The funds, approximately $7.3 million, were used to purchase 14 oil and gas well workover rigs and associated equipment. Ramco[1] has filed its petitions under Chapter 11 and Chase as assignee of the notes and security instruments seeks to terminate the automatic stay or, alternatively, for adequate protection.

The questions presented are whether the security interests were validly perfected under applicable state law and, if so, whether those interests are adequately protected.

The loan proceeds were advanced during 1981 as the equipment was purchased. Ramco executed security agreements to the bank which were filed, under the Uniform Commercial Code, centrally in Oklahoma, in Runnels County, Texas and also in Kingfisher County, Oklahoma. In July, 1982 Penn Square Bank was declared insolvent, the Federal Deposit Insurance Corporation was appointed receiver and subsequently assigned the loans and security interests to Chase. The bankruptcy reorganization proceeding was commenced in early 1983. At that time the entire $7.3 million was due, with interest, and the collateral was worth less than half that amount.

Following the complaints and answers there was a preliminary hearing in June, at which time the automatic stay was continued in effect pending the final hearing which occurred within 30 days.

The gist of the matter is whether Ramco as debtor in possession can avoid the liens on the workover rigs under the strong arm powers of 11 U.S.C. § 544. It contends, in sum, that the rigs are motor vehicles which require perfection under the Oklahoma Motor Vehicle Act by entry upon the certificate of title. 47 O.S.1981 § 23.2b. Penn Square did not seek to perfect under this section.

Chase contends that the rigs are mobile goods and, therefore, perfection under the Uniform Commercial Code was proper. *See* 12A O.S.1981 § 9–103.1(3). This requires a determination of where Ramco was located and whether the rigs are trucks or mobile goods.

The first inquiry is necessary for the UCC provides that the law of the jurisdiction where the debtor is located governs perfection. It continues to say that a debtor is deemed located at his place of business or at his chief executive office. 12A O.S. 1981 §§ 9–103.1(3)(b) and (d). Ramco contends that some of the rigs were employed in Texas and, therefore, its laws govern as to them. However, when the notes and security instruments were executed Ramco consistently showed an Oklahoma address. Furthermore Ramco's president testified that the "home office" was Oklahoma City; that records were kept there; and that "ultimate supervision" was from Oklahoma City. This shows that the "chief executive office" is in Oklahoma which is a debtor's location if it has more than one place of business. 12A O.S.1981 § 9–103.1(3)(d). Oklahoma law thus controls perfection and the next question is whether the bank filed in the proper places.

Ramco contends the workover rigs are vehicles and lien perfection is upon the certificate of title by the taxing authority. 47 O.S. 1981 § 23.2b. That section, however, excepts "special mobilized equipment." Security interests in mobile goods are perfected under the UCC. 12A O.S.1981 § 9–103.-1(3)(a). If the UCC controls and if the rigs

1. Separate petitions have been filed by a partnership, Ramco Equipment Ltd., 1981–1 and the general partner Ramco Well Service, Inc.

The bank's complaints have been consolidated for trial.

are mobile the bank perfected its liens when it filed centrally in Oklahoma. 12A O.S.1981 § 9–401.

■ It appears that the pertinent provisions of the Motor Vehicle Act and the Oklahoma UCC were not drafted with each other in mind as there is no distinct line as to when one or the other applies. It is clear, however, that special mobilized machinery is outside the perfection procedures applicable to motor vehicles even though certificates of title may be available for them. The question can thus be narrowed to whether these rigs are within the definition of "special mobilized equipment" in the Motor Vehicle Act.

The Motor Vehicle Act definition of special mobilized equipment is

"... special purpose machines, either self-propelled or drawn as trailers or semitrailers, which derive no revenue from the transportation of persons or property, whose use of the highway is only incidental, and whose useful revenue producing service is performed at destinations in an area away from the traveled surface of an established open highway." 47 O.S.1981 § 22.1(27).

If the rigs are within this definition their perfection is not governed by the Motor Vehicle Act. We must, thus, review the evidence concerning what workover rigs are and what functions they perform.

■ They move from well to well and provide capabilities to service and treat the well and its equipment in various ways. Once arriving at a location a rig will normally remain for several days or weeks depending upon the work to be performed and problems encountered. The primary function of a rig is to raise and lower tubing and rods in and out of the hole. In order to accomplish this they have a powerful engine, drawworks and a mast. The components are all mounted on a carrier which has rubber tires and can be driven on the highways. The mast telescopes and is carried horizontally atop the other equipment. Upon arriving at the well the mast is elevated to the upright position above the well and telescoped its full length to perform the rig's functions. A drawing of a typical workover ready for service is shown on the appendix to this decision.

Testimony showed that these rigs are not trucks in the ordinary sense of the word. The carriers are specially made of I-beams as opposed to pressed steel; one industrial, not vehicular engine, powers both the carrier and the drawworks; and they have 4 or 5 axles, depending on their weight which can be in excess of 100,000 pounds. In order to travel on the highway the rigs require special over weight and over size permits. They will normally be 50 to 57 feet in length, 13½ feet in height and 9 feet wide. Some smaller workover rigs are mounted on a truck chassis but none of that type are involved here.

The rigs at issue clearly are not ordinary trucks and don't perform any function of hauling goods from one location to another where they are unloaded. They are, therefore, classified as "special purpose machines" under the definition in 47 O.S. 1981 § 22.1(27).

This, however, doesn't complete the inquiry for the definition requires that they derive no revenue from the transportation of persons or property; that their use of the highways be incidental; and that they produce revenues away from the highways. *Id.*

The testimony indicated that most operators charge for moving the rigs to and from the well locations on a mileage or per diem basis. This fee, however, is not for transportation in the sense that a truck transports property to a location where it would be deposited.

It likewise appears that the ability of workover rigs to travel on the highway is incidental to their primary function of providing services to the well. The only reason they are mobile is to be able to travel to the well site where the work is done. Likewise, their useful revenue producing function is performed off the road at the well.

It thus appears that, as a matter of fact, the rigs are special mobilized equipment as defined by 47 O.S. 1981 § 22.1(27) and,

therefore, security interests in them are not perfected under the motor vehicle statutes due to the exception in 47 O.S. 1981 § 23.2b(A)(1).

An official of the Oklahoma Tax Commission also testified that the Commission treats the rigs as special mobilized machinery for determining the fees to be paid for their registration and use permits.

Ramco points to *In re Sooner Oil & Gas Corporation,* 24 B.R. 479 (Bkrtcy.W.D.Okl. 1982) where this Court considered these same statutory provisions in connection with perfection of a security interest in an oil well perforating truck. That vehicle was held to be outside the definition of special mobilized machinery, requiring perfection under the Motor Vehicle Act. The vehicle in *Sooner,* however, was substantially different from those considered here. The decision shows that the truck chassis was acquired from a dealer and the perforating equipment was then mounted on it. It was a "truck" in every sense. In defining "truck" the Motor Vehicle Act says they are " ... every motor vehicle of the truck type ... including oil well servicing units." 47 O.S. 1981 § 22.1(32). A perforating truck is certainly of the "truck type" when an ordinary truck chassis is employed to carry the specialized equipment. It also bears repetition that the Tax Commission categorizes workover rigs as special mobilized machinery, and its official testified that sometimes they are small enough to mount on truck chassis and then are "truck type" and registered accordingly. Another person with 40 years experience in the well servicing industry said "truck type" would mean a unit of some sort mounted on a conventional truck. It appears that the Oklahoma Legislature intended that workover rigs mounted on ordinary trucks be of the "truck type" and those on special carriers be classified special mobilized machinery.

Ramco then argues that these rigs do not fall under the "mobile goods" section of the UCC for they are not normally used in more than one jurisdiction. 12A O.S.1981 § 9–103.1(3)(a). The testimony showed that workover rigs are, of course, mobile but that economics will not allow them to travel great distances in the usual course of business. They are, however, often used in more than one jurisdiction depending upon how that term is employed. For example if an operator has yards in more than one state a rig might be stationed at one for a period and then moved to another. One witness stated that he operated a well servicing business in the northern part of the Texas panhandle and his rigs were frequently used in Texas, Oklahoma, Kansas, Colorado and occasionally in New Mexico. The interstate use of the rigs obviously depends upon the particular operator, the nature of his business and his customers' requirements as well as where the business happens to be located. In Ramco's case some of the rigs were located and used in Texas and some in Oklahoma.

It is also persuasive that the comment to the original version of Oklahoma's UCC states that mobile equipment includes "oil field rigs and equipment." Okla.Stat.Ann. tit. 12A, § 9–103 commentary at 216 (1961) (current version at 12A O.S.1981 § 9–103).

Ramco also argues that Penn Square knew that some of the rigs were to be used in Texas and, therefore, ought to have perfected its purchase money security interests in that state. For this it relies on 12A O.S. 1981 § 9–103.1(1)(c). That subsection, however, relates to "ordinary goods" not to those classified as mobile.

When this discussion began we pointed out that Oklahoma law relating to perfection of security interests in articles of this type is neither settled nor clear. Considering all the evidence as a whole, however, we think the correct decision is to say they are special mobilized machinery, not covered by the Motor Vehicle Act, and mobile goods under the UCC.

The bank, therefore, has perfected security interests in the 14 workover rigs owned by Ramco.

The lien perfection issue, however, is not concluded for Ramco questions perfection in other items. These articles are trailers,

power swivels, blowout preventers and pumps, some located in Texas and others in Oklahoma. The bank perfected against them in the same fashion as the workover rigs, centrally in Oklahoma, in Runnels County, Texas and Kingfisher County, Oklahoma.

The testimony shows that 2 trailers, 2 power swivels, 3 triplex pumps and 9 blowout preventers were moved to Texas within 30 days of their purchase by Ramco. Nine blowout preventers and 2 triplex pumps remained in Oklahoma.

Chase conceded at the trial, rightfully so, that the security interests in the pumps and blowout preventers located in Texas were not perfected for the law of that state requires a central filing. The Oklahoma conflicts rule, under these facts, applies Texas law. 12A O.S. 1981 § 9–103.1(1)(c). This leaves for consideration the trailers in Texas and the other equipment in Oklahoma.

■ There is no serious contention that pumps, blowout preventers, pumps and power swivels are anything but ordinary goods under the UCC. They are large, heavy articles moved only with substantial difficulty. The place to perfect against them is by central filing in Oklahoma. 12A O.S.1981 § 9–401(1)(c).

The bank made a central filing and, therefore, its interest is perfected in these items.

■ The trailers, however, are a different matter. They are within the definition of vehicles under the Motor Vehicle Act. 47 O.S.1981 § 23.1 et seq. It was required, therefore, that security interests be perfected by notation upon the certificates of title which was not done. 47 O.S.1981 § 23.-2b(A)(1). Accordingly, the bank does not have a perfected security interest in the trailers and it is entitled only to an unsecured claim for amounts relating to them.

The bank then requests termination of the automatic stay to permit repossession of the items in which it has a valid security interest or, alternatively, for adequate protection. Since it seeks to act against prop-

erty of the estate we look at the requirements of 11 U.S.C. § 362(d)(2), whether there is equity in the rigs and other equipment and whether they are necessary to an effective reorganization. The bank easily met its burden on showing lack of equity. The testimony is uncontroverted that when the petitions were filed in March, 1983 the equipment had a value of less than half of the $7.3 million owed the bank. Ramco, however, contends the rigs are necessary to an effective reorganization since operating them is its only business.

This brings us to consideration of the word effective in the context of automatic stay litigation under 11 U.S.C. § 362(d)(2)(B). In *In re Koopmans,* 22 B.R. 395, 407 (Bkrtcy. D.Utah, 1982) Judge Mabey reviewed the history of this requirement and stated that "... property in which the debtor has no equity is necessary to an effective reorganization whenever it is necessary, either in the operation of the business or in a plan, to further the interests of the estate through rehabilitation or liquidation."

In a recent decision this Court stated that "the term 'necessary' requires the court to find that the property is essential, in light of all the circumstances, to an effective reorganization of the estate." *Twelve Percent Secured Noteholders v. Amarex, Inc.,* 30 B.R. 763 at 767 (Bkrtcy.W.D.Okl.1983). We further noted that this fact must be ascertainable at the time of consideration to lift the stay and that a clear showing must be made. *Id.*

Due to the drastic decline in the oil and gas business in this locale and accompanying decline in value of workover rigs it is difficult to say that Ramco could ever liquidate the equipment for amounts which would realize anything for unsecured creditors. The prospects of rehabilitation, however, also need to be considered as a form of reorganization. It would obviously be impossible for Ramco to rehabilitate itself without the rigs. It did produce credible proof that the depressed condition of the industry may take a turn in the reasonably near future and that rehabilitation may be

possible for the simple reason that many competitors have been forced out of the business by liquidation or foreclosure.

■ We thus hold that the rigs and other equipment in which the bank holds a security interest are necessary to an effective reorganization. In so holding we emphasize that time is an element of effectiveness. Ramco's exclusive period to propose a plan under 11 U.S.C. § 1121(b) has expired and no plan has been proposed at this date. There has been no indication what progress is occurring with regard to negotiation and formulation of a plan but if an undue passage of time begins to cause loss to the estate without reasonable prospect of rehabilitation then issues of conversion or dismissal may be raised. See 11 U.S.C. § 1112(b)(1) and (3). The language of *Continental Illinois National Bank & Trust Company of Chicago v. Chicago, Rock Island & Pacific Railway Company,* 294 U.S. 648, 685, 55 S.Ct. 595, 610, 79 L.Ed. 1110 is particularly appropriate where it says:

"It is true that no plan has yet been consummated; and, so far as the record shows, none has been prepared or is in the course of preparation. If this long delay were without adequate excuse, the retention of the injunction for the long period which has intervened since it was granted could not be justified. But the delay is obviously due to the many doubts and uncertainties arising from the present litigation. Until they are finally resolved, the consummation, or even the preparation of any definite plan is plainly impracticable. With these doubts and uncertainties now removed, the proceeding should go forward to completion without further delay, or be dismissed."

Since the automatic stay remains effective we must consider Chase's alternative request for adequate protection. The focus is primarily on the interest in property requiring protection and the measure of what protection would be adequate in the circumstances. The Bankruptcy Code, of course, does not define adequate protection but leaves it for case determination.

To a large extent the concept of adequate protection follows from then Referee Herzog's findings affirmed in *In re Bermec Corporation,* 445 F.2d 367 (2d Cir.1971). There it was stated that the debtor's obligation is to pay for "economic depreciation" so as to preserve the *status quo* of holders of secured claims.

The interest in property to be protected here is the bank's lien on the rigs and equipment securing a claim of $7.3 million with interest to the date of the petitions. Since the value of the collateral is far less than the claim we need not consider post petition interest or other contractual charges. 11 U.S.C. § 506(a).

■ Thus, the interest in property protected ". . . is from any impairment in value attributable to the stay." *In re Alyucan Interstate Corp.,* 12 B.R. 803, 808 (Bkrtcy.D. Utah 1981). This means that the secured creditor is entitled to assurance that the value of its lien does not decrease as a result of the stay or, if it does, that it receive something to compensate it for the decrease. It does not mean that if the creditor was undersecured on the petition date it is entitled to take the collateral. If the value of the collateral is not declining the debtor need do nothing. *Id.* at 809. That is exactly what Ramco purposes. Its argument is that the rigs and equipment are not declining in value and, therefore, Chase has no interest requiring protection. The basis for the contention is that the petition was filed at the nadir of the market for oil field equipment. We must thus examine the evidence concerning changing values.

As noted previously, workover rigs are not ordinary vehicles subject to depreciation by new models and the distance driven. They are machines which, if properly maintained and serviced, can perform their intended functions for long periods. The record shows that the rigs and equipment cost $7.3 million in 1981 and when the petitions were filed in March, 1983 had an appraised value of about $2 million. Of course what is relevant is whether there is a continuing

decline in value whatever that amount may be.

Much of the testimony regarding depreciation centered on the fact that the rigs will deteriorate if the engines and hydraulic systems are not run at least weekly. The debtor's officer stated that this procedure was employed and his testimony that the equipment is adequately maintained was not controverted.

Ramco called an independent rig appraiser who appeared knowledgeable concerning recent auctions and other sales of workover rigs. His testimony, in sum, was that the market was so poor in March, 1983 that it was not foreseeable it would decline further; and that there had been some improvements since that time.

Considering all the evidence it appears that there has been no measurable depreciation in the equipment values since the petition date and, so long as the rigs are adequately maintained and insured, the bank's security interest in them is adequately protected. It is, of course, able to monitor future maintenance procedures and insurance protection as it sees fit. Accordingly, the alternative prayer for adequate protection is denied.

This decision constitutes the findings of fact and conclusions of law required by BR 7052 and an appropriate judgment will be entered.